[S. F. No. 20479. In Bank. June 22, 1961.]

DYKE WATER COMPANY (a Corporation), Petitioner, v. PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

Richard P. Roe, H. O. Van Petten and Frederick L. Simmons for Petitioner.

William M. Bennett, Chief Counsel, Roderick B. Cassidy, Assistant Chief Counsel, and J. Thomason Phelps, Principal Counsel, for Respondents.

McCOMB, J.—Petitioner, a public utility corporation in the water business in Orange County, seeks to obtain an annulment of an order of respondent Public Utilities Commission pursuant to the provisions of section 1756 of the Public Utilities Code.[1]

[1]Section 1756 of the Public Utilities Code reads: ''Within 30 days after the application for a rehearing is denied, or, if the application is granted, then within 30 days after the decision on rehearing, the applicant may apply to the Supreme Court of this State for a writ of certiorari or review for the purpose of having the lawfulness of the original order or decision or of the order or decision on rehearing inquired into and deter-

## CHRONOLOGY

(1) August 6, 1957, petitioner filed an application for authorization to increase its rates charged for water service. The application was amended on October 8, 1957. By such application petitioner sought authority to increase its rates for general flat rate service from a basic amount of $3.00 per service connection per month to $4.50 and to increase its general metered service rates from $2.50 per meter per month for the first 1,000 cubic feet or less to $3.75, with corresponding increases in the unit quantity rates.

(2) November 1, 1957, a public hearing on the amended application was held at Santa Ana, California.

(3) December 17, 1957, upon the record of the proceedings held November 1, 1957, the commission rendered its Decision No. 56003 (56 P.U.C. 105), making an interim order authorizing petitioner to increase its monthly residential flat rate from $3.00 to $3.75, with corresponding increases in the rates and charges in petitioner's general metered service schedule, pending final determination of the application.

(4) From December 26, 1957, through May 8, 1959, public hearings on the application for authorization to increase rates and an investigation on the commission's own motion into the rates, rules, regulations, contracts, operations, and practices pertaining to and involving water main extensions of petitioner were held at various times.

(5) May 5, 1959, petitioner filed a petition for a proposed report pursuant to rule 69 of the commission's Rules of Procedure.

(6) May 8, 1959, petitioner moved for a supplemental hearing to determine whether the commission would consider material outside the record in the making of its decision.

(7) May 12, 1959, the commission denied petitioner's motion made May 8, 1959, but granted petitioner's application for a proposed report pursuant to rule 69.

(8) May 28, 1959, the proposed report of Examiner Stewart C. Warner was filed.

(9) No action was taken by the commission with respect to the proposed report for almost 10 months, until an opinion and order, Decision No. 59828, dated March 22, 1960, with

mined. The writ shall be made returnable not later than 30 days after the date of issuance, and shall direct the commission to certify its record in the case to the court. On the return day, the cause shall be heard by the Supreme Court, unless for a good reason shown it is continued.''

an effective date of April 11, 1960, was filed by the commission.[2]

(10) March 31, 1960, petitioner filed a petition for a rehearing before the commission, which petition was denied May 9, 1960.

---

[2]Decision No. 59828 reads as follows: ''The above-entitled application of Dyke Water Company, a corporation, was filed August 6, 1957, and amended on October 8, 1957. The applicant sought and seeks authority to increase its rates for general flat rate service from a basic amount of $3 per service connection per month to $4.50, a 50 per cent increase, and to increase its general metered service rates from $2.50 per meter per month for the first 1,000 cubic feet or less to $3.75, with corresponding increases in the unit quantity rates, also representing an increase of 50 per cent. The estimated increase in gross annual revenues at the proposed rates is approximately $375,000.

''A public hearing on the First Amendment to the application was held before Commissioner Rex Hardy and Examiner Stewart C. Warner on November 1, 1957, at Santa Ana. The purpose of said hearing was to establish a record as to whether or not the applicant should receive interim rate relief. Based upon such record, an interim opinion and order (Decision No. 56003, dated December 17, 1957) authorized the applicant to increase its monthly residential flat rate from $3 to $3.75, with corresponding increases in the rates and charges in the general metered service schedule. Said interim decision found the existence of exigent circumstances, primarily a financial emergency, which justified the authorized increases in rates and charges.

''By an order dated October 30, 1956, the above-entitled investigation was instituted.

''Public hearings on both of the above matters were held on a consolidated record before Commissioner Hardy and Examiner Warner on December 26, 1957; before Commissioner Matthew J. Dooley and Examiner Warner on January 14 and 15, 1959, and before Examiner Warner on March 18, April 17, 20, 21, 22, 23, 24, 27, 28 and 30, and May 1, 1959, at Santa Ana, and May 5, 6, 7 and 8, 1959, in Los Angeles. Orange County Water District appeared as an interested party to urge that applicant be required to install meters on all customers' premises for water conservation purposes; Pacific Water Co. appeared as an interested party and as a protestant in so far as the proposed increase in rates for water service might affect certain areas where applicant was furnishing water service outside its certificated area and within the certificated area of Pacific; one customer of the applicant appeared to report the results of a survey made of applicant's customers in Midway City regarding their views on flat rate service versus general metered service; 9 letters from customers were received and read into the record by the presiding officer at hearings when so received; and an exhibit was introduced by the applicant as an affidavit that 18,500 post cards had been mailed by the applicant on March 23 and 24, 1959, to its customers seeking their views on the questions of (1) whether they wanted meters installed at their houses, and (2) whether they would pay 75 cents more a month 'to put your water company on a paying basis and sound financial position to preserve the low flat rate basis of water distribution which has been so successful here?'

''On May 5, 1959, the applicant filed a Petition for Proposed Report pursuant to Rule 69 of the Commission's Rules of Procedure; on May 8, 1959, applicant's counsel moved for a supplemental hearing to determine how the Commission arrives at its decisions; on May 12, 1959, the

These questions are presented for our determination:

■ First. *Was the order to install meters beyond the jurisdiction of the commission?*

*No.* Section 761 of the Public Utilities Code reads: "Whenever the commission, after a hearing, finds that the rules, practices, equipment, appliances, facilities, or service of any

Commission granted said petition and directed the presiding Examiner to prepare and file a proposed report, denied said motion for a supplemental hearing on grounds that it was improper, and concluded that, having granted the petition, oral argument before the Commission en banc would be unnecessary and cancelled such argument set for May 19, 1959.

"The proposed report was prepared and filed in accordance with such directions, pursuant to the Commission's Rule 70, on May 28, 1959. Exceptions thereto were filed, pursuant to Rule 71, by the applicant, by Pacific Water Co., and by the Commission staff, on June 19, 1959; by Orange County Water District on June 22, 1959; and by the City of Garden Grove on June 24, 1959. Replies to said exceptions were filed by Orange County Water District on June 30, 1959, and by the applicant on July 6, 1959. The matters stand submitted and are ready for decision. ·

"No material exception to evidentiary facts outlined in the proposed report was taken by any party, and such facts and review of the evidence in the proceeding need not be repeated herein. The Commission hereby finds that those sections of the proposed report dealing with factual and evidentiary matters constitute true statements of the evidence and of the facts and as such they are hereby adopted by the Commission.[1]

"Table 14-A of Exhibit No. 19 includes a Summary of Earnings for the years 1957, 1958 Estimated, and 1959 Estimated at prior interim and proposed rates at present operations, as follows:

| Account | Year 1957 Recorded | Year 1958 Estimated | Year 1959 Estimated Present Operations | | |
|---|---|---|---|---|---|
| | | | Prior Rates | Interim Rates | Proposed Rates |
| | (Using Straight-Lines Income Tax Depreciation) | | | | |
| Operating Revenues . | $675,025 | $875,000 | $751,000 | $938,700 | $1,126,200 |
| Operating Expenses | | | | | |
| Oper. and Maintenance | 219,575 | 232,900 | 249,800 | 249,800 | 249,800 |
| Adm. and Gen., | | | | | |
| Misc. Exp. . . . . . . . . | 135,020 | 70,000 | 72,200 | 72,200 | 72,200 |
| Taxes other than | | | | | |
| Income . . . . . . . . . | 120,102 | 36,500 | 39,800 | 39,800 | 39,800 |
| Depreciation . . . . . . . . | 122,507 | 97,200 | 102,500 | 102,500 | 102,500 |
| Taxes on Income . . . . | 13,220 | 193,000 | 106,100 | 207,300 | 308,400 |
| Total Expenses . . | 610,424 | 629,600 | 570,400 | 671,600 | 772,700 |
| Net Revenue . . . . . . . | 46,601 | 245,400 | 180,600 | 267,100 | 353,500 |
| Depr. Rate Base . . . . . | —— | 929,000 | 1,123,000 | 1,123,000 | 1,123,000 |
| Rate of Return . . . . . . | —— | 26.42% | 16.08% | 23.78% | 31.48% |

"The record shows that since 1954 the applicant has computed and paid income taxes using accelerated income tax depreciation as a deductible expense, and no testimony was adduced by the applicant that it

"[1]The sections to which reference is here made are headed *General Information; Accounting Procedures; Earnings; Financial Conditions; Meters; Main Extension Practices; Metropolitan Water District Water; Staff Recommendations;* and *Pacific Water Co. Evidence.*

public utility, or the methods of manufacture, distribution, transmission, storage, or supply employed by it, are unjust, unreasonable, unsafe, improper, inadequate, or insufficient, the commission shall determine and, by order or rule, fix the rules, practices, equipment, appliances, facilities, service, or

---

intended to claim income tax depreciation on any other basis for the year 1959 or for any future period.

"The question of what rate treatment should be given to reduce federal income tax payments resulting from the use of accelerated depreciation as permitted by Section 167 of the Internal Revenue Code, is under consideration by the Commission, and pending determination of the problem by the Commission we have considered straight-line depreciation for income tax purposes in this matter. When decision is made by the Commission as to the use of accelerated depreciation, then such necessary adjustments, if any, will be made by the Commission in respect to income tax payments made by the utility.

"Based upon the entire record and being fully cognizant of the views of the various parties, the Commission makes the following findings and conclusions. In viewing such findings and conclusions it should be kept clearly in mind that the basic matters of concern in these proceedings are two: namely, applicant's request for increased revenues and the Commission's investigation of applicant's main extension practices. All other issues, although of some importance, are ancillary.

"In the basic matter of revenues, the Commission finds that the revenues produced by the rates authorized in the interim order herein (Decision No. 56003) have fully met the needs of the financial emergency then existing and foreseen. The Commission finds as a fact that there is not presently such an emergency situation as would necessitate or otherwise justify a continuance of the increased rates and charges authorized by such interim order. It is fair and reasonable and in the public interest, therefore, to terminate the rates and charges authorized on the interim basis.

"One ancillary issue directly affecting revenues and the earning position of applicant is that concerning the needs for metering of service connections. The evidence on this subject is substantial and convincing that the public interest requires that applicant's system be fully metered at the earliest practicable date. The record indicates, from the testimony of applicant's president, that the financing of a metering program would be feasible.[2] It appears reasonable, therefore, to require that applicant immediately undertake the installation of meters on existing service connections at a rate of no fewer than 400 meters each month until all have been metered. All new service connections, of course, shall be metered as they are placed in service.

"The Commission finds that applicant's estimates of revenues, expenses and rate base for the year 1959 are unrealistic, unreliable and unreasonable. The estimates of the Commission staff,[3] however, are found to be fair and reasonable and are hereby adopted for the rate-making purposes of the proceeding. Such will be used in testing the reasonableness of applicant's earning position at the rates and charges in effect prior to the interim order herein. After making appropriate modifications to the staff-derived figures so as to recognize reasonable increased revenues, greater expenses and a higher rate base for a properly metered system and giving due cognizance of the trend of rate of return as occasioned by

---

"[2]Testimony of Dyke Lansdale, TR 1974-1977.

[3]As Contained in Exhibit No. 19.

methods to be observed, furnished, constructed, enforced, or employed. The commission shall prescribe rules for the performance of any service or the furnishing of any commodity of the character furnished or supplied by any public utility, and, on proper demand and tender of rates, such public utility shall furnish such commodity or render such service within the time and upon the conditions provided in such rules.''

the refunding of advances for construction during the year 1960 and subsequent years, the Commission concludes that applicant would earn a rate of return of somewhat more than 7 per cent on a depreciated rate base of approximately $2,269,000. The Commission finds such a rate of return on such a rate base to be within the zone of reasonableness and concludes, therefore, that the pre-interim rates and charges for water service will, during the foreseeable future, enable applicant to fully meter its system, provide sufficient and properly qualified personnel function efficiently, conform to all the requirements of law and to earn a fair and reasonable return on its investment in plant devoted to public utility water service. The pre-interim rates will be reinstated.

''In the basic matter of main-extension practices, the Commission finds that applicant has extended its water system into territory into which it had no right to extend, and pursuant to agreements which are unlawful.[4] Such extensions have been imprudent and the resulting involvement in making repayment of large sums of money out of revenues to defray the cost of capital additions to applicant's plant, both within and without applicant's certificated area, made by persons as advances for construction, clearly constitutes unlawful conduct; reveals a failure to recognize the minimum responsibility incumbent on the part of applicant's management; and indicates a failure to apply prudent management principles in the conduct of applicant's public-utility water business. Further, it appears that applicant may have contracted for long-term debt[5] without having obtained this Commission's authority therefor as required by law. The Commission would be derelict in its duty of protecting the public interest if it were to countenance any continuation of these unlawful and imprudent practices or permit the burdening of utility customers with added costs attributable to such improper practices. The Commission concludes that applicant must immediately cease and desist from any extension practice which does not comply strictly with the lawfully effective Rule No. 15 concerning main extensions.

''The Commission finds as a fact that the public interest and standard accounting practices require that applicant should be directed to adjust its books of account to conform to the balance sheet as of December 31, 1957, after adjustments, as shown on Table 4-B of Exhibit No. 19; that applicant should be directed to continue to carry out and place into effect the staff recommendations contained in Chapter 16 of Exhibit No. 19; and that applicant should be directed to immediately dispose of its recorded contributions pursuant to the classification and itemization in Appendix C of Exhibit No. 44 in accordance with the staff recommendations contained in Chapter 4 of said exhibit.

''The Commission finds as a fact that the rates and charges for water service hereinafter ordered to be reinstated are for the future fair and reasonable rates and are justified by the record in this proceeding. Further, it is found as a fact that in so far as existing rates and charges

''[4]See Exhibit No. 44.
[5]In the sum of $376,078 as shown in Exhibit No. 57.

Section 770 of said code reads: ''The commission may after hearing:

''(a) Ascertain and fix just and reasonable standards, classifications, regulations, practices, measurements, or serv-

---

differ from those hereinafter prescribed, such existing rates and charges are for the future unjust and unreasonable.

''ORDER

''Application as above entitled, as amended, having been filed, and an investigation on the Commission's own motion into the rates, rules, regulations, contracts, operations and practices pertaining to and involving water main extensions of Dyke Water Company, a corporation, having been instituted, public hearings having been held, an Examiner's Proposed Report and Exceptions and Replies to said Report having been filed and having been fully considered, and based on the record and the findings of fact and conclusions hereinbefore set forth,

''IT IS HEREBY ORDERED as follows:

''1. The rates and charges established by Decision No. 56003, issued December 17, 1957, and set forth therein as Appendix A, are hereby terminated as of the seventh day following the effective date of this order.

''2. Coincidental with the termination of said rates and charges there are hereby reinstated, as the regularly filed and effective rates and charges of the Dyke Water Company, tariff 'Schedule No. 1, General Metered Service, Cal. P.U.C. Sheet No. 69-W' and tariff 'Schedule No. 2, General Flat Rate Service, Cal. P.U.C. Sheets Nos. 116-W and 117-W.'

''3. Dyke Water Company is hereby directed to adjust its books of account to conform to the balance sheet as of December 31, 1957, after adjustments, as shown on Table 4-B of Exhibit No. 19 in this proceeding.

''4. a. Dyke Water Company shall install meters on all new service connections installed on and after the effective date of this order; and

''b. Dyke Water Company shall immediately institute a metering program and shall install, so as to permanently convert from flat rate to metered service, not less than 400 meters per month, in addition to metering all new service connections, until all residential and other general service connections shall have been metered; and

''c. Shall within ninety days after the effective date of this order and every one hundred eighty days thereafter, report to this Commission in writing the total number of meters installed, together with the net number of meters installed during the period covered in each such report, until all of its service connections have been metered.

''5. Dyke Water Company is directed to continue to carry out and place into effect the staff recommendations contained in Chapter 16 of Exhibit No. 19.

''6. a. Dyke Water Company is directed to immediately dispose of its recorded contributions pursuant to the classification and itemization in Appendix C of Exhibit No. 44 in accordance with the staff recommendations contained in Chapter 4 of said exhibit; and

''b. Within ninety days after the effective date of the order herein, certify to the Commission in writing, over the signature of a responsible officer, that it has complied herewith.

''7. Dyke Water Company shall immediately cease and desist from entering into any contract for an extension of its water system or any part thereof except such as shall strictly comply with its Rule No. 15 or upon specific order of this Commission.

''8. Case No. 5841 is discontinued.

''9. The effective date of this order shall be April 11, 1960.

''Dated at San Francisco, California, this 22nd day of March, 1960.''

ice to be furnished, imposed, observed, and followed by all electrical, gas, water, and heat corporations.

"(b) Ascertain and fix adequate and serviceable standards for the measurement of quantity, quality, pressure, initial voltage, or other condition pertaining to the supply of the product, commodity, or service furnished or rendered by any such public utility

"(c) Prescribe reasonable regulations for the examination and testing of such product, commodity, or service and for the measurement thereof.

"(d) Establish reasonable rules, specifications, and standards to secure the accuracy of all meters and appliances for measurements.

"(e) Provide for the examination and testing of any and all appliances used for the measurement of any product, commodity, or service of any such public utility."

In *Title Guar. etc. Co.* v. *Railroad Com.*, 168 Cal. 295, 302 [142 P. 878, Ann.Cas. 1916A 738], it was held that a city vested with regulatory powers over water companies in existence prior to the passage of the Public Utilities Act had the power to require them to install meters at their own expense, the requirement that meters be used being an incident of the rate-fixing process.

It is clear from the above-quoted sections of the Public Utilities Code that the Legislature intended to, and did, confer upon the commission power to require a public utility to install meters at its own expense. Such a power is necessary and desirable in order to prevent a waste of the product being distributed and discrimination between consumers.

Second. *Was the commission's order directing the installation of meters unreasonable?*

*No.* ■■■ In the present case the commission ordered as follows: "4. b. Dyke Water Company shall immediately institute a metering program and shall install, so as to permanently convert from flat rate to metered service, not less than 400 meters per month, in addition to metering all new service connections, until all residential and other general service connections shall have been metered; and

"c. Shall, within ninety days after the effective date of this order and every one hundred eighty days thereafter, report to this Commission in writing the total number of meters installed, together with the net number of meters installed during the period covered in each such report, until all of its service connections have been metered."

Several years before, in a prior decision, No. 53858, reported at 55 P.U.C. 235, issued on October 1, 1956, in which petitioner was granted a certificate of public convenience and necessity authorizing water service in an extensive area in Orange County, the commission had ordered petitioner to install meters in the following language: "1. (e) That Dyke Water Company shall forthwith institute a program of metering of water service in the certificated areas shown on the map, Appendix A, and shall report its progress in writing to the Commission within ninety days after the effective date hereof and every ninety days thereafter for a period of four years."

There was good reason for this order. As early as July 7, 1954, the following resolution was adopted by the Board of Directors of the Orange County Water District:

"WHEREAS, it has been called to the attention of the members of the Board of Directors of the Orange County Water District that a wasteful usage of water is occurring in many of the residential sections located within the Orange County Water District; and

"WHEREAS, analysis of this situation indicates that most of this wasteful usage of water prevails in areas where water is being served to the individual users on a 'flat rate' basis; and

"WHEREAS, one of the powers of the Orange County Water District as defined in Paragraph 6 of Section 2 of the OCWD Act as amended reads as follows: 'For the common benefit of said district, to store water in underground water basins or reservoirs within or outside of said district, to appropriate and acquire water and water rights within or outside of said district, to import water into said district, and to conserve water within or outside of said district';

"Now, THEREFORE, BE IT RESOLVED, that the Secretary Manager be and he is hereby authorized and requested to bring this matter to the attention of the Public Utilities Commission, and request said Commission to do all within its power to require compliance of all utilities subject to its jurisdiction serving domestic water within the boundaries of the Orange County Water District with the following conditions:

(1) That totalizing water meters be installed on all service connections; and

(2) That applicable rates be established on a volume basis."

The commission's order to install meters was not challenged

by petitioner. On the contrary, petitioner forwarded the following letter to the commission on February 11, 1957: "Referring to Decision No. 53858 and pursuant to ordering paragraph 1(e), we have had conferences with various meter companies in an effort to determine the cost and expense for metering.

"Proposals have been submitted to one meter company and if accepted we will be able to commence some of the installations within six months.

"Will keep you advised as to our progress."

Other portions of Decision No. 53858, however, and certain related decisions, were challenged by petitioner in petitions for writs of review addressed to this court on March 18, 1957, in S.F. 19657-19660. Nowhere in these petitions[3] was any question raised with respect to the lawfulness or reasonableness of the commission's order to install meters.

On the contrary, petitioner continued to represent to the commission that meters were being installed. On May 6, 1957, it forwarded the following letter to the commission: "Referring to Decision No. 53858 and pursuant to order Paragraph 1 (e), we are submitting our second report.

"During the past ninety days we have installed the following quantities of meters:

| | |
|---|---|
| 15 | ¾″ meters |
| 8 | 1″ meters |
| 5 | 1½″ meters |
| 5 | 3″ meters |
| Total | 33 meters |

"We are preparing to commence installation of meters at the rate of fifteen to twenty per day and will report in ninety days further progress with respect to this."

On October 10, 1957, it forwarded the following letter to the commission: "In reference to Decision No. 53858, Order 1E, Dated October 1, 1956, this is to inform you that since January 1, 1957, we have installed eighty-two meters.

"We are installing meters regularly and will continue to do so."

On October 8, 1957, petitioner filed an amendment to its application, in which it requested "authority to place into effect immediately on an interim basis the rates as proposed in its original Application," representing to the commission

---

[3]The petitions were denied by this court, without opinion, on August 27, 1957.

that ''The present financial condition of Applicant is such that emergency conditions exist.''

The first public hearing was held on the amended application on November 1, 1957, at which time an expert witness, *testifying on behalf of petitioner,* after stating he was familiar with the commission's order on metering, was asked his opinion as to whether meters are necessary in this company's system. His reply was, *''I think they are essential.''*

At the same hearing another expert witness, testifying on behalf of petitioner, in support of an estimate of petitioner's rate base for 1956 and succeeding years, stated that his estimate ''reflects a start of a metering program which, by the end of the year 1961, meters 10,000 customers,'' using the principle of ''metering services of this company at the rate of 2,500 per annum, starting January 1, 1958, which makes 10,000 meters as of the end of 1961.''

This witness also testified in support of his estimates of ''additional moneys necessary to finance Dyke Water Company.'' These estimates were of $100,000 a year for each of the years 1958 through 1961, inclusive, for a ''metering program.''

On December 17, 1957, as stated above, the commission issued Decision No. 56003, in which petitioner was authorized, on an interim basis, pending final decision, to charge substantially increased rates.

The matter was set for further hearing on December 26, 1957, but, at petitioner's request, was continued to a date to be later fixed.

Hearings were resumed on January 14, 1959. On January 15, 1959, the Orange County Water District expressed its concern that the metering program contemplated by petitioner, as reflected in the evidence above described, was inadequate, and offered evidence that annual water usage per service connection on petitioner's largely unmetered system was 0.94 of an acre-foot, compared with an average annual use of 0.57 of an acre-foot in four other nearby metered water systems, most of which had extensive industrial and commercial usage; that most of the water underlying the Orange County Water District is Colorado River water, imported under a ground water recharge program financed by a replenishment assessment levied at a uniform rate on all production of water from the ground water supplies of the district basin; that there was an unnecessary usage of approximately 7,000 acre-feet of water per year in the service area of petitioner;

that water had been observed on many occasions running down the curbs in places where unmetered water service was being rendered; that it would cost the district approximately $84,000 to replace these 7,000 acre-feet of water in the ground water supplies; that under the district's assessment plan petitioner would be required to pay only $27,300 of said $84,000; and that those using water from unmetered systems were being subsidized by those using water from metered systems. The district confirmed and again urged upon the commission its resolution of July 7, 1954.

On May 7, 1959, shortly before the matter was submitted, Dyke Lansdale, president of petitioner, when asked on cross-examination what steps had been taken to implement the commission's order to institute a metering program, stated that petitioner had started a program for installing meters on all industrial and odd or oversized lots and in schools; that only tracts did not have meters, and that "we have done very little tract work since the order was put out"; that "I feel that within the next two years it will be unnecessary for any of us to meter"; and that the only plans petitioner then had for the metering of flat rate customers was a plan to install a meter on those customers who had been reported as wasters of water.

Testifying in response to a question as to whether he had made any investigation with respect to the financing of a metering program, Mr. Lansdale answered in the affirmative, and said that petitioner had had several offers for the sale of meters on an installment plan; that there was one offer to "install the meter for us and bill us for an installed meter and they would take their money out of the increased revenues"; that the financing of a metering program through the water meter suppliers or manufacturing companies was feasible; and that "you can get the metering company to make almost any type of an arrangement as long as they can get their money. I mean time isn't a big factor with them. There are three or four big metering companies and they are very, very competitive."

From the foregoing narrative it is clear that for the purposes of persuading the commission to grant it a rate increase petitioner professed wholehearted willingness to install meters, but that as soon as substantial rate relief was granted by the commission, to be effective for an indefinite period, the metering program was renounced.

When the commission issued its order on March 22, 1960,

directing petitioner to install not less than 400 meters per month, petitioner had had three and a half years since the issuance of the commission's prior order on October 1, 1956, within which to formulate a plan of its own.

The commission gave no credence to the representations contained in Dyke Lansdale's affidavit of March 30, 1960, in support of petitioner's petition for rehearing with respect to the commission's March 22, 1960, order. The affidavit alleges in substance that the commission's order would impose an impossible financial burden on petitioner and jeopardize its service; that the installation of 400 meters per month would require the employment of seven working crews and a foreman, plus additional capital equipment and personnel. Even if these allegations were entitled to any credence, it is to be noted that they assume that petitioner would have to do the installation work, and that the cost of such work would exceed petitioner's financial resources.

But President Dyke Lansdale himself had previously testified that numerous metering companies would compete for the opportunity to do the work of installation on favorable credit terms.

At this late date petitioner is hardly in a position to complain that the commission's order of March 22, 1960, is impossible or unreasonable.

Nor was there anything unreasonable about requiring petitioner to bear the cost of installation of meters rather than imposing such cost upon the ratepayers. To require utility ratepayers to pay for capital installations in the form of meters not only is a departure from customary ratemaking, but also is wrong in principle. It results in a double burden upon ratepayers in that the ratepayers not only bear capital costs, but also continue, throughout the life of the plant installed, to produce a return to the utility upon the cost of the plant. (*Cf. Title Guar. etc. Co.* v. *Railroad Com., supra,* 168 Cal. 295, 302 et seq.)

Third. *Was the commission required to grant petitioner's request for a rehearing in order to hear evidence pertaining to the results of petitioner's operations occurring subsequent to the close of the hearings and before the issuance of the commission's decision?*

*No.* Rehearings are not matters of right before the commission, but are pleas addressed to the sound discretion of that body. The discretion to be invoked is that of the body making the order and not that of a reviewing court. (*Inter-*

*state Commerce Com.* v. *City of Jersey City,* 322 U.S. 503, 514 et seq. [64 S.Ct. 1129, 88 L.Ed. 1420].) It is therefore evident that in the present case petitioner's application for a rehearing was not improperly denied by the commission.

 Fourth. *Was the commission justified in reaching different conclusions from those of the examiner, although adopting certain of his findings?*

*Yes.* In its decision the commission stated: "The Commission hereby finds that those sections of the proposed report dealing with factual and evidentiary matters constitute true statements of the evidence and of the facts and as such they are hereby adopted by the Commission."[4]

Petitioner contends that the commission's decision was "arbitrary and capricious" in adopting as true sections of the report but issuing an order that was inconsistent with, and contrary to, the recommended order of the commission's examiner. In support of this, petitioner contends that the commission was guilty of a "flat misstatement" in stating, "The record indicates, from the testimony of applicant's president, that the financing of a metering program would be feasible." This statement by the commission is supported by the record. The transcript shows the following testimony of President Dyke Lansdale: "Q. I want to confine my questions here principally right now to the financing and am I to understand from your statement that the financing of a metering program through the water meter suppliers or manufacturing companies is a feasible way to accomplish it? A. Yes, I feel that there are several different methods that could be worked. Q. Are feasible? A. Yes, it will work."

It appears from the examiner's proposed findings and conclusions that the examiner adopted as reasonable certain estimates, offered in evidence by the commission's staff, of petitioner's revenue, expenses, and rate base for the year 1959. These estimates showed that petitioner would earn for the year 1959 a return of 16.08 per cent at the rates in effect prior to the rates authorized by the commission's interim decision; 23.78 per cent under the rates authorized by the interim order; 31.48 per cent at the rates proposed by petitioner in its application; and 11.90 per cent on the assumption that petitioner's entire system would be metered.

The reason why the old rates, as well as the interim and proposed rates, were calculated to yield such high returns

---

[4]In a footnote the commission identified the sections indicated by referring to the section headings used in the proposed report.

is to be found in certain practices of petitioner involving extensions of its water mains to newly developed territory during a number of years from 1952 to 1958. Such extensions were governed, or should have been governed, by petitioner's Rule and Regulation Number 15, published and filed with the commission as a part of its tariff. This rule, when so published and filed, had the force and effect of a statute, and any deviations therefrom were unlawful unless authorized by the commission. (*California Water & Tel. Co.* v. *Public Util. Com.*, 51 Cal.2d 478, 501 [23] [334 P.2d 887].)

 Petitioner's rule in effect until August 15, 1955, provided that applicants for extensions to new subdivisions were required to advance and deposit with petitioner the estimated cost of construction, and that thereafter petitioner would pay to the depositor, for a period not to exceed 10 years, 35 per cent of the gross revenue due from consumers connected to the extension, but not more than the amount of such cost. A new rule prescribed by the commission, and effective on and after August 15, 1955, reduced the amount of the refunds to 22 per cent of the annual revenue from customers served from the extension, for not to exceed 20 years.

The evidence shows that from 1952 to 1958 petitioner entered into over 300 contracts for such extensions; that the advances under such agreements totaled $3,203,000; that many of these contracts required refunding at the rate of 35 per cent of petitioner's gross annual revenues from such extensions; that other such contracts involved unlawful deviations from petitioner's tariff rule; and that the refunds petitioner was required to pay constituted about one quarter of its gross revenues at the interim rates.

The Uniform System of Accounts for Water Utilities established by the commission prescribes the use of a deferred credit account called "Advances for Construction," in which shall be recorded "such advances for construction made in accordance with the utility's rules and regulations, as are to be refunded either wholly or in part. . . ."

When physical plant is constructed or installed with the use of such advances, it is required that the cost be recorded in a utility's appropriate plant accounts.

For rate-fixing purposes the commission as a matter of policy, in calculating a utility's rate base, deducts from the balance in the plant accounts the balance in the Advances for Construction Account. The reason for such a deduction is that the commission considers it unreasonable to allow a utility to

earn a return upon property the cost of which has been advanced by prospective consumers or subdividers of property. (*Del Este Water Co.*, 52 P.U.C. 479, 482 [1].)

Upon repayment of such advances, however, such deductions cease *pro tanto*, and plant costs defrayed by such repaid advances become a part of the utility's rate base for rate-fixing purposes.

This policy of the commission, and the rate-fixing principles contained therein, were recently challenged in a petition for writ of review addressed to this court in *Suburban Water Systems* v. *Public Utilities Com.*, S.F. No. 20484, which was denied without opinion on August 10, 1960.

Good reasons were offered by the commission's staff for declining to adopt all of the conclusions of the examiner, and the record supports the commission in the adoption of other and different findings and conclusions.

Fifth. *Did the commission err in not hearing oral argument of petitioner?*

*No.* Petitioner contends that it has been prejudiced, since it has never had an opportunity to orally argue the merits of the application and the case before any official other than the hearing officer, although petitioner requested such argument and the commission had set argument on the application and the case before the commission in bank on May 19, 1959.

Petitioner was given ample opportunity to be heard by the filing of exceptions to the examiner's proposed report. The commission's rules governing proposed reports are these:

"Upon direction by the Commission, the presiding officer shall prepare and file his proposed report. The Secretary's office shall cause copies thereof to be served upon all parties to the proceeding. Such proposed report shall contain recommended findings, conclusions, and order." (Rule 70.)

"A party may serve and file exceptions to a proposed report within twenty days after service thereof. Exceptions shall be specific, and stated and numbered separately. Exceptions to factual findings shall specify the portions of the record relied upon; proposed substitute findings; and proposed additional findings, with supporting reasons. Exceptions to conclusions shall cite statutory provisions or principal authorities relied upon; proposed substitute conclusions; and proposed additional conclusions." (Rule 71.)

"Replies may be served and filed within fifteen days after service of exceptions." (Rule 72.)

These rules were complied with in the proceeding before the

commission. Petitioner was served with a copy of the proposed report and filed lengthy exceptions thereto, as well as a reply to exceptions filed by other parties.

■ Arguments may be either written or oral. Due process requires no more. In the case of *Federal Communications Com.* v. *WJR*, 337 U.S. 265, 275 [69 S.Ct. 1097, 93 L.Ed. 1353], the Supreme Court of the United States stated: ". . . due process of law has never been a term of fixed and invariable content. This is as true with reference to oral argument as with respect to other elements of procedural due process. For this Court has held in some situations that such argument is essential to a fair hearing [citation], in others that argument submitted in writing is sufficient. [Citations.]"

In *Morgan* v. *United States*, 298 U.S. 468, 481 [56 S.Ct. 906, 80 L.Ed. 1288], it was said: "Argument may be oral or written. The requirements are not technical."

■ In the present case it is evident that petitioner had ample opportunity to present written arguments to the commission, and the commission was not required to hear oral arguments.

■ Sixth. *Did the commission err in considering material outside the record?*

*No.* The commission's order provides: "After making appropriate modifications to the staff-derived figures so as to recognize reasonable increased revenues, greater expenses and a higher rate base for a properly metered system and giving due cognizance of the trend of rate of return as occasioned by the refunding of advances for construction during the year 1960 and subsequent years, the Commission concludes that applicant would earn a rate of return of somewhat more than 7 per cent on a depreciated rate base of approximately $2,269,000."

Petitioner contends: "It would appear from the quoted statement that material outside the record was considered by the Commission, and that on consideration of such extraneous matters, the recommended order of the hearing officer based upon evidence within the record was rejected."

The commission first ordered petitioner to install meters in 1956 and had evidence before it of a continuing urgent need for such installations. When it decided to order petitioner to install a specific minimum number of meters per month, it assumed that petitioner would do so, and that its plant in service, i.e., rate base, would thereby be substantially increased.

The commission also assumed that petitioner would perform its contractual obligations to refund advances for construction, thus diminishing the balance in its "Advances for Construction" account, and thereby increasing its rate base.

With a rate base increasing as a result of these two factors, petitioner's rate of return would show a downward trend during 1960 and subsequent years from 16.08 per cent, estimated at the prior rates, to something approximating 7 per cent.

If these assumptions had not been made by the commission, it might have been constrained to reduce petitioner's rates even below what they were when the application for an increase was filed in order to reduce the excessive 16.08 per cent return.

These assumptions, however, rested upon evidence in the record, and it cannot be justly said that they involved consideration of "material outside the record."

There is likewise no merit in petitioner's contention that "Petitioner had no opportunity to even know what material was being considered by the Commission or being received by the Commission from its staff in arriving at the opinion and order which is the subject of this Petition," in view of the fact that exceptions to the proposed report of the examiner were filed by the commission's staff and served upon petitioner.

In the instant case the commission had the record before it, and nothing appears to rebut the presumption that the decision of the commission was made after a consideration of the record. (*Pacific Indem. Co.* v. *Industrial Acc. Com.*, 28 Cal.2d 329, 339 [6] [170 P.2d 18].)

 Seventh. *Did the commission err in failing to consider evidence of petitioner?*

*No.* Petitioner has not pointed out any evidence that the commission failed to consider.

 Eighth. *Was the commission's decision unlawful because of its treatment of federal income taxes?*

*No.* In its decision the commission said: "The question of what rate treatment should be given to reduce[d] federal income tax payments resulting from the use of accelerated depreciation as permitted by Section 167 of the Internal Revenue Code, is under consideration by the Commission, and pending determination of the problem by the Commission we have considered straight-line depreciation for income tax purposes in this matter. When decision is made by the Com-

mission as to the use of accelerated depreciation, then such necessary adjustments, if any, will be made by the Commission in respect to income tax payments made by the utility.''

Petitioner says this is ''uncertain and unclear'' in that ''it is impossible to ascertain therefrom the effect of present and anticipated federal income taxation on Petitioner's revenues,'' and ''Petitioner is unable to ascertain the present, and anticipated consequences of the opinion and order with respect to the payment of and allocation for anticipated income tax obligations.''

It is not clear just what petitioner means. Obviously nothing the commission says can affect petitioner's obligation to pay its taxes.

Following the case of *Galveston Elec. Co.* v. *City of Galveston,* 258 U.S. 388, 399 [7, 8] [42 S.Ct. 351, 66 L.Ed. 678], the commission for rate-fixing purposes has recognized and allowed income taxes as an operating expense. The amount of such taxes is usually arrived at after a deduction for depreciation of depreciable property.

Section 167 of the Internal Revenue Code of 1954 permits, at the taxpayer's option, several ways of calculating depreciation for income tax purposes. Among them are: '' (1) the straight line method, (2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1).''

Following the adoption of this legislation by Congress, the commission was repeatedly faced, in numerous public utility rate proceedings, with the difficult problem of what amount of money to allow for income taxes as an operating expense in cases where the utility had elected, or indicated its intention to elect, a method of accelerated depreciation for income tax purposes, thereby increasing the depreciation deduction, and decreasing the amount of taxes paid or to be paid.

Various alternatives were open, among them being (a) an amount calculated by the straight-line method irrespective of what method was used in calculating the amount of taxes that were actually paid or to be paid; and (b) allowance only of taxes actually paid, or to be paid, under whatever method of depreciation the utility elected.

In the present proceeding the evidence shows that petitioner had elected the double rate declining balance method of computing depreciation, thereby increasing the depreciation

deduction and decreasing the amount of income taxes it would actually pay.

For rate-fixing purposes, however, and for the reasons given, the commission recognized the larger amount of tax which would have resulted from the use of straight-line depreciation. This, of course, redounded to petitioner's advantage, in that it reduced the amount of net income after taxes recognized by the commission as available for return on rate base, and tended to strengthen petitioner's showing in support of its request for increased rates.

 Ninth. *Were the rates fixed by the commission confiscatory?*

*No.* Petitioner says that the confiscatory nature of the commission's order is shown by even a cursory examination of the facts in the instant case. Petitioner's argument in support of this statement is erroneous.

First, it assumes that the financial emergency which the commission found in December 1957 in issuing an interim rate order upon a limited and incomplete record was proven by the complete record, and that such emergency continued through December 31, 1958. In its final decision, however, the commission found, "In the basic matter of revenues, the Commission finds that the revenues produced by the rates authorized in the interim order herein (Decision No. 56003) have fully met the needs of the financial emergency then existing and foreseen. The Commission finds as a fact that there is not presently such an emergency situation as would necessitate or otherwise justify a continuance of the increased rates and charges authorized by such interim order. It is fair and reasonable and in the public interest, therefore, to terminate the rates and charges authorized on the interim basis."

This finding was fully justified by the evidence of estimates that petitioner would earn a 16.08 per cent return in 1959.

Secondly, petitioner's argument assumes that the interim rate of $3.75 was reasonable because the examiner proposed such a conclusion. But for good reasons the commission was fully justified in declining to adopt that conclusion.

Thirdly, petitioner's argument assumes that it was reasonable to impose upon petitioner's consumers a surcharge of 75 cents per month each for meters. But for the reason that petitioner's own president testified the financing of meters was not a problem, and that a surcharge would impose a double burden on the ratepayers, the commission was justified in refusing to impose such a surcharge.

Fourthly, petitioner argues that its failure to pay any dividend demonstrates that a $3.00 rate is confiscatory. It cites no authority for such a position, and none has been found.

▉▉▉ This court in *Market St. Ry. Co.* v. *Railroad Com.*, 24 Cal.2d 378, 397 [150 P.2d 196], said: "Thus responsibility for rate fixing, insofar as the law permits and requires, is placed with the commission, and unless its action is clearly shown to be confiscatory the courts will not interfere"; ▉▉▉ and on page 399 [2] [24 Cal.2d]: ". . . The petitioner herein must be charged with the burden of showing that the evidence does not support the commission's finding of value, and that the reduced rate is unreasonable and will result in confiscation of its property. That burden is coupled with a strong presumption of the correctness of the findings and conclusions of the commission."

In *Federal Power Com.* v. *Hope Natural Gas Co.*, 320 U.S. 591, 602 [64 S.Ct. 281, 88 L.Ed. 333], the court said: ". . . the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of 'pragmatic adjustments.' . . . And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. . . . Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. [Citations.] It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end."

The order of the commission is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., White, J., and Dooling, J., concurred.

Petitioner's application for a rehearing was denied July 19, 1961.