[S.F. No. 22794. In Bank. Nov. 26, 1971.]

CITY AND COUNTY OF SAN FRANCISCO, Petitioner, v.
PUBLIC UTILITIES COMMISSION et al., Respondents;
PACIFIC TELEPHONE AND TELEGRAPH COMPANY,
Real Party in Interest.

[S.F. No. 22793. In Bank. Nov. 26, 1971.]

CONSUMERS ARISE NOW et al., Petitioners, v.
PUBLIC UTILITIES COMMISSION, Respondent;
PACIFIC TELEPHONE AND TELEGRAPH COMPANY,
Real Party in Interest.

(Consolidated Appeals.)

120

## COUNSEL

Thomas M. O'Connor, City Attorney, Milton H. Mares, Deputy City At-torney, and William F. Bourne for Petitioner in No. 22794.

Garret Shean, in pro. per., and William M. Bennett for Petitioners in No. 22793.

Mary Moran Pajalich and Timothy E. Treacy for Respondents.

Warren A. Palmer as Amicus Curiae on behalf of Respondents.

Pillsbury, Madison & Sutro, John A. Sutro, Noble K. Gregory, George H. Eckhardt, Jr., and Richard W. Odgers for Real Party in Interest.

## OPINION

**PETERS, J.**—These are consolidated proceedings to review Decision No. 77984 of the Public Utilities Commission of the State of California. The decision provides that the Pacific Telephone and Telegraph Company (Pacific) may use accelerated depreciation with the normalization method of accounting as defined in subsection $(l)(2)(B)$ of section 167 of the Internal Revenue Code and that, if it elects to do so, the commission, for rate making purposes, will compute Pacific's tax expense on the basis of straight line depreciation for the purpose of establishing its cost of service and will give recognition to the normalization tax reserve in determining rate base. The decision was made effective immediately.[1]

It appears that the general approach employed by the commission for determining what constitutes permissible rates is to determine for a "test period" the costs and expenses which can be attributed to providing the service, the rate base of the utility (value of property devoted to public use), and the reasonable rate of return to be allowed the utility on its rate base. The "test period" costs, expenses, and rate base are then adjusted to allow for the effect of various known or reasonably anticipated changes. By adding the adjusted costs and expenses to the rate of return (in recent years between 5 and 8 percent) multiplied by the rate base, as adjusted,

---

[1]The decision was by Chairman J. P. Vukasin, Jr., and was signed by Commissioners William Symons, Jr., and Vernon L. Sturgeon. Chairman Vukasin, Jr., also filed a concurring opinion. Commissioners Thomas Moran and A. W. Gatov dissented.

the necessary gross revenues are determined, and the rates are then fixed to produce such gross revenues. (See *Pacific Tel. & Tel. Co.* v. *Public Util. Com.,* 62 Cal.2d 634, 643-645 [44 Cal.Rptr. 1, 401 P.2d 353].) Under this system an increase in a cost item will ordinarily be reflected as an increase in the rates, and a reduction in the rate base will produce a reduction in the rates. However, the increase in cost will be reflected in its full amount in the rates, while the reduction in the rate base will be reflected only to the extent of the reasonable rate of return, between 5 and 8 percent of the reduction.

In computing the cost of service for rate making purposes, the utility is allowed to recover its federal income taxes as a cost of business. In computing the federal income tax cost the utility is allowed to deduct depreciation, and the greater the depreciation for tax purposes (all other things being equal) the less the tax liability and the less the necessary rate to recover it.

Since 1954, the federal government has permitted straight line or accelerated depreciation in determining federal income tax liability. Straight line depreciation provides for essentially uniform annual write-offs of a depreciable asset over the life of the asset. Accelerated depreciation provides for larger allowances as expenses than straight line depreciation during the early years of the life of the asset but during later years the depreciation expense attributable to the asset will ordinarily be less than if the straight line method had been used. Because of the relation between depreciation and tax liability, it would follow in *theory* that accelerated depreciation would result in lower tax liability or tax expense in the early years as compared to straight line depreciation but that in subsequent years the tax liability would exceed that had straight line been used and thus lead to higher rates. In theory there would be lower rates in the earlier years under accelerated depreciation but higher rates in later years. However, in *practice,* the tax saving of the earlier years, although in a sense repaid in the subsequent years, does not result in higher taxes and rates in the later years because the utilities tend to increase their investment in plant and equipment every year so that the increased depreciation due to acceleration in any year will more than offset any reduced depreciation due to the effect of accelerated depreciation as to older assets.[2]

---

[2]In the language of the commission majority opinion: "Accelerated depreciation . . . provides for larger than straight-line annual write-offs of a depreciable asset during early years and diminishing annual write-offs during later years of the asset's life. For a given depreciable asset, the total amount written off during its lifetime would be the same under either depreciation method but the rates of accruals would differ. For a group of assets of different vintages, the diminution of accruals for older plant can be obscured by the larger accruals on newer plant."

Apparently all utilities other than Pacific and General Telephone have used accelerated depreciation in computing and paying their federal income taxes. The commission has in the past required the utilities using accelerated depreciation to pass on the tax savings to the consumer in the form of lower rates (in computing the cost of service for the purpose of fixing rates, the actual tax liability was used rather than the greater tax liability that would have been due had straight line depreciation been used for tax purposes). This passing on to the consumer of the tax savings is called "flow-through."

Pacific and General Telephone, unlike other utilities, have refused to use accelerated depreciation in filing their income tax returns. On November 6, 1968, in Decision No. 74917 the commission determined that Pacific's management was imprudent in not electing to take accelerated depreciation for income tax purposes. The commission concluded that it could not compel Pacific to take the accelerated depreciation on its federal income tax return, but it held that for purposes of rate making Pacific would be treated as if it had obtained the tax saving of accelerated depreciation and that the saving would be flowed-through to the consumers in the form of lower rates. (Imputed accelerated depreciation with flow-through.) Notwithstanding this, Pacific continued to determine its federal tax liability using straight line depreciation.

In section 441 of the Tax Reform Act of 1969, Congress amended section 167 of the Internal Revenue Code to limit the use of accelerated depreciation by utilities in determining income tax liability. Subsection (*l*)(2) provides: "In the case of any post-1969 public utility property, the term 'reasonable allowance' [for depreciation] as used in subsection (a) means an allowance computed under—

"(A) a subsection (*l*) method [straight line depreciation (see Int. Rev. Code, § 167, subs. (*l*)(3)(F))],

"(B) a method otherwise allowable under this section [such as accelerated depreciation] if the taxpayer uses a *normalization* method of accounting, or

"(C) the applicable 1968 method, if, with respect to its pre-1970 public utility property of the same (or similar) kind most recently placed in service, the taxpayer used a flow-through method of accounting for its July 1969 accounting period."[3] (Italics added.)

---

[3] All utilities, other than Pacific and General Telephone, are eligible to come under clause (C) and thus continue to use accelerated depreciation for tax purposes with flow-through of the tax savings to the consumer. It would seem that Pacific and

Subsection (*l*)(3)(G) defines normalization: "In order to use a normalization method of accounting with respect to any public utility property—

"(i) the taxpayer must use the same method of depreciation to compute both its tax expense and its depreciation expense for purpose of establishing its cost of service for rate making purposes and for reflecting operating results in its regulated books of account, and

"(ii) if, to compute its allowance for depreciation under this section, it uses a method of depreciation other than the method it used for the purposes described in clause (i), the taxpayer must make adjustments to a reserve to reflect the deferral of taxes resulting from the use of such different methods of depreciation."

The commission permitted argument by interested parties in this matter. However, it refused to accept any evidence and struck evidence previously received (some correspondence between Pacific and the Internal Revenue Service).

The commission found that it had in its 1968 decision imputed to Pacific for tax purposes accelerated depreciation with flow-through pointing out that Pacific had an option to use accelerated depreciation; that Pacific had used straight line depreciation in its income tax returns through the year 1969, and that under the Tax Reform Act of 1969 could accelerate depreciation for tax purposes only if it normalized. The commission concluded that it would now declare that it intended to use normalization of taxes in setting Pacific's rates so that Pacific could commence acceleration under subsection (*l*)(2)(B) with regard to its 1970 taxes.

The majority opinion reasoned that the commission could not continue the existing method of imputing accelerated depreciation. The commission said of its 1968 ruling: "The imputation of accelerated depreciation with flow-through did not deprive Pacific of its property without due process because there was then no legal restriction against Pacific's changing to accelerated depreciation with flow-through and paying essentially those income taxes that had been allowed in the decision. [¶] That no longer is the case. If we now were to attempt to impute accelerated depreciation with flow-through for setting rates in this proceeding, the law clearly would preclude Pacific from actually using accelerated depreciation in filing its federal income tax returns. We thus would be assuming lower taxes than

---

General Telephone may not resort to the option provided by clause (C) because they did not use accelerated depreciation in 1968 or in their July 1969 accounting period.

Pacific would be required by law to pay. . . . *Since accelerated depreciation with flow-through is no longer an option available to Pacific under federal law, it would now be futile to consider the relative merits of flow-through and normalization.*" (Italics added.)

We have concluded that the commission has erred in refusing to consider the merits of adhering to the 1968 method of *imputing* accelerated depreciation with flow-through and that for this reason its decision must be annulled. Under the 1968 method Pacific filed its federal income tax return on the basis of straight line depreciation but for rate purposes the tax expense was calculated on the basis of accelerated depreciation and the savings flowed-through to the ratepayers. Subsection (*l*)(2)(A), quoted above, provides that the utility may use straight line depreciation in its federal income tax returns, and there are no conditions to the resort to straight line.

The commission and Pacific do not dispute that there are no conditions to the use of straight line depreciation in the subsection. Their position is that, if straight line depreciation is used in filing the income tax return, due process requires that its tax expense for rate-making purposes be its actual tax expense and that it would be a denial of due process to *impute* accelerated depreciation in computing its tax expense for rate making purposes.

■ Income tax expense must be considered by the commission in establishing Pacific's cost of service. (See *Galveston Elec. Co.* v. *Galveston,* 258 U.S. 388, 399 [66 L.Ed. 678, 684, 42 S.Ct. 351]; *Dyke Water Co.* v. *Public Utilities Com.,* 56 Cal.2d 105, 127 [14 Cal.Rptr. 310, 363 P.2d 326].) ■■ However, "the primary purpose of the Public Utilities Act is to insure the public adequate service at reasonable rates without discrimination; and the commission has the power to prevent a utility from passing on to the ratepayers unreasonable costs for materials and services by disallowing expenditures that the commission finds unreasonable. (*Pacific Tel. & Tel. Co.* v. *Public Utilities Com., supra,* 34 Cal.2d 822.)" (*Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 647.)

■ The same rule applies where the utility resorts to accounting practices which result in unreasonably inflated tax expense. It was on the basis of this rule that the commission in 1968 determined to *impute* accelerated depreciation to Pacific in determining its tax expense. In Decision 74917, the commission stated that for the period 1954-1967 Pacific's taxes would have been $225,000,000 less if it had used accelerated depreciation for

the entire period, and that in other words, "Pacific's ratepayers might have had to pay some $450,000,000 less if Pacific had availed itself of the lawful option of using accelerated depreciation for tax purposes. . . ."[4] If it had been using accelerated depreciation, the savings in the test year would have been $27,400,000 with a resultant savings effect on gross revenues of approximately $57,000,000. (69 Cal. P.U.C. 53, 61-62.) The commission found that a "true tax saving" will continue to result from accelerated depreciation for at least as long as plant additions equal or exceed plant retirements and pointed out that without exception Pacific's witnesses foresee a continuing growth of plant, one estimate involving a doubling of plant in 10 years and compounding of growth during the next 20 years.[5] (*Id.*, at p. 62.)

The commission found that management's discretion has exceeded a reasonable and prudent course respecting income taxes to the detriment of the public interest and that it was fair and reasonable and in the public interest to compute Pacific's income tax expense for the test year on the basis of the use of accelerated depreciation beginning with plant additions in the test year. (*Id.*, at p. 90.)

Under its general power to prevent a utility from passing on to its ratepayers unreasonable costs, the commission in the instant proceeding, notwithstanding the change in the federal tax statute, could properly find that the federal income tax calculated on the basis of straight line depreciation involved an unreasonable expense and that the unreasonable expense due to such calculation was due to an imprudent management decision.

Although prior to the statutory change Pacific was free to change its

---

[4]Apparently the commission assumed a 50 percent tax rate.

The fact that the necessary increase of revenue is approximately double the tax expense suggests the reason why Pacific refused to shift to accelerated depreciation with flow-through when it could do so.

On the other hand, there is substantial reason, other than benefit to its ratepayers, for a utility to voluntarily switch from straight line depreciation to accelerated depreciation with flow-through. Ordinarily there will be some period during which the utility pays reduced taxes on the basis of accelerated depreciation before the commission adjusts rates to reflect the reduced payments. During that period the savings due to accelerated depreciation will inure to the benefit of the utility.

[5]It should also be recognized that in the unlikely event the rate of investment should decrease, there could be a net tax increase in a given year but that so long as the utility remains a going concern and must continue with some investment there will be an overall tax saving while it continues accelerated depreciation. In other words, so long as there is a single dollar of new investment, there will be a tax deferral.

method of accounting on its income tax returns but now may no longer do so, its inability to switch is due to its original imprudent determination to pay federal income taxes on a straight line depreciation basis and its obstinacy after the 1968 commission decision in adhering to the imprudent determination.

As pointed out in footnote 3, any utility which used a flow-through method of accounting for its July 1969 accounting period may continue to do so under clause (C) of subsection (2). There is no suggestion in the majority opinion or the two dissenting opinions that, if Pacific were eligible for accelerated depreciation and flow-through in paying its federal taxes, Pacific would not be required to compute its federal tax expense on such basis for rate making purposes.[6] It thus seems clear that the only reason it is not treated in this manner is that in prior years it imprudently refused to file returns on a basis of accelerated depreciation and then after the 1968 decision obstinately continued in its imprudent refusal.

The effect of Pacific's refusal in 1968 to switch to accelerated depreciation was to cast a significant burden on itself. By refusing to switch to accelerated depreciation in filing its income tax returns after it was aware that such depreciation would be imputed to it for rate making purposes in calculating federal tax expense, Pacific in essence placed itself in the position of paying a large income tax bill, part of which was unnecessary and was not to be recovered in higher rates. As to that part, Pacific in a sense placed itself in the position of having to raise additional funds, either debt or investment. Nevertheless, Pacific chose to do so.

It should also be pointed out that the effect of the instant decision is to permit Pacific to include as an expense for rate making purposes a large amount of federal income taxes which it will not be required to pay in the foreseeable future. Although the majority opinion ignores this matter, the concurring opinion and the two dissenting opinions recognize that accelerated depreciation and normalization will result in the ratepayers contributing capital to Pacific. As the concurring opinion points out, this method of accounting will "provide a source of interest-free capital." We do not know how much capital will be provided, but the dissenting commissioners estimate that the ratepayers in the next 10 years will have to provide between $750,000,000 and one billion dollars. Commissioner Moran in his dissenting opinion states that if the ratepayers are required to put up the capital for the telephone system, it "is indeed a step toward

---

[6]The concurring opinion of Chairman Vukasin, Jr., suggests a contrary view.

socialism and logically could lead ultimately only to government owner-ship of the telephone system . . . ."

■ Although Commissioner Moran may be overstating the matter, it is clear that requiring ratepayers to put up the capital for the telephone system is contrary to the basic principle of utility rate setting. ■ The basic principle is to establish a rate which will permit the utility to recover its cost and expenses plus a reasonable return on the value of property devoted to public use. (*Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 644-645.) ■ By permitting Pacific to include in its costs a charge for federal taxes greatly in excess of its actual federal tax expense, the commission is deviating from this basic principle. We realize that the 1968 commission decision also deviated from the basic principle by refusing to permit Pacific to include in its costs all of its tax expense, but this deviation was based on Pacific's imprudent management.

■ It should also be pointed out that the effect of the instant deci-sion is to reward Pacific for its imprudent management as compared to other utilities which prudently had adopted accelerated depreciation and flow-through prior to August 1969. Apparently, these utilities will con-tinue to be required to flow-through the benefits of accelerated depreciation to the ratepayers, whereas Pacific will be allowed to use accelerated depre-ciation without requiring flow-through, thus retaining most of the benefits for itself.

In the circumstances, we are satisfied that, in the light of Pacific's past imprudence, the commission could reasonably have ordered Pacific to continue the accounting practices established in the 1968 decision and that the commission abused its discretion in expressly *refusing to consider* imputed accelerated depreciation and flow-through as established in the 1968 decision.

■ The argument that in the light of the federal tax amendment there will be a denial of due process in continuing the 1968 treatment falls on its face in view of Pacific's conduct. Prior to the federal tax amendment and after the 1968 decision of the commission, Pacific could have elected to change its accounting procedures in filing its returns and thereby saved substantial tax expense. Pacific, however, chose not to do so. The only effect of the federal tax amendment is to take away the option which Pacific had already rejected. Requiring Pacific to do that which it had freely chosen to do cannot be said to be a denial of due process. In other words, after the 1968 decision, Pacific, if it chose could have opted for

accelerated depreciation on its tax returns. It did not do so. Had it done so, Pacific could have used accelerated depreciation with flow-through. Now the option to switch to accelerated depreciation and flow-through has been terminated, but even assuming the absence of the option is a matter to consider by the commission, it does not mean that continuation of the 1968 treatment will result in a denial of due process.

For failure to consider lawful alternatives in calculation of federal income tax expense, the decision of the commission must be annulled. (Cf. *Northern California Power Agency* v. *Public Util. Com.*, 5 Cal.3d 370, 380 [96 Cal.Rptr. 18, 486 P.2d 1218].) Upon further consideration the commission should consider whether to adhere to the 1968 method of determining federal income tax expense and whether to adopt the accelerated depreciation and normalization method adopted by the decision before us. Because these methods involve fictitious allowances for tax expense and because they provide results which in the light of current federal income tax law are either harsh on the utility or the ratepayers, the commission may also consider alternative approaches which strike a balance between these two extremes.

The 1968 method of imputed accelerated depreciation and flow-through is favorable to the ratepayer but harsh on Pacific. In terms of the 1967 figures, as compared to straight line depreciation for tax purposes, this method would save the ratepayer 54 million dollars but Pacific would in a sense be penalized 27 million dollars. The method adopted by the decision before us is harsh on the ratepayer who under the 1967 figures will be compelled to lose most of the 54-million-dollar saving but is beneficial to Pacific which will be permitted rates including the 54 million.

These two methods are extremes when compared to the nontelephone utilities which, having switched to accelerated depreciation with flow-through prior to 1970, may continue with that method and permit the ratepayers the consequent reduction without being compelled to pay the tax on the basis of straight line depreciation. Although the method open to the nontelephone utilities is not open to Pacific, the commission is not compelled to adopt one of the two extremes set forth above but may adopt a compromise striking a proper balance between the interests of the ratepayers and Pacific in the light of current federal income tax statutes.

Both of the extreme methods involve a fictitious charge of federal tax expense. The 1968 method deliberately understates the actual tax expense on the basis of the imprudent management of Pacific. The method adopted in the decision before us deliberately overstates the actual tax expense in

order to normalize. Since a fictitious figure must be used under either method, it is not improper for the commission to use an additional fictitious factor to limit the harsh results. Insofar as the compromise would impose a lesser burden on Pacific than is permissible consistent with due process (lesser than the burden under imputed accelerated depreciation with flow-through), Pacific is not in a position to make due process objections.

The decision is annulled.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Schauer, J.,* concurred.

The petition of the real party in interest for a rehearing was denied December 23, 1971. Sullivan, J., did not participate therein.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.