MEMPHIS LIGHT, GAS AND WATER
DIVISION, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,
Texas Gas Transmission Corporation,
Tennessee Valley Municipal Gas
Assoc., etc., Intervenors.

MEMPHIS LIGHT, GAS AND WATER
DIVISION, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,
Texas Gas Transmission Corporation,
American Public Gas Associa-
tion, Intervenors.

TENNESSEE VALLEY MUNICIPAL
GAS ASSOCIATION et al.,
Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent,
Texas Gas Transmission Corporation,
Intervenor.

PUBLIC SERVICE COMMISSION OF the
STATE OF NEW YORK, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,
Texas Gas Transmission Corporation,
Intervenor.

Nos. 24517, 24518, 24602 and 24632.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 28, 1971.

Decided Feb. 18, 1972.

Rehearings Denied in Nos. 24517 and
24632 May 11, 1972.

Mr. George E. Morrow, Memphis, Tenn., with whom Mr. Reuben Goldberg, Washington, D. C., was on the briefs, for petitioner in Nos. 24517 and 24518.

Mr. Morton L. Simons, Washington, D. C., for petitioner in No. 24632.

Mr. J. Richard Tiano, Asst. Sol. F. P. C., with whom Messrs. Gordon Gooch, Gen Counsel, and Abraham R. Spalter, Asst. Gen. Counsel, F. P. C., were on the brief, for respondent. Mr. Israel Convisser, Atty., F. P. C., also entered an appearance for respondent.

Mr. Christopher T. Boland, Washington, D. C., with whom Mr. Richard J. Connor, Washington, D. C., was on the brief, for intervenor Texas Gas Transmission Corp. Mr. George J. Meiburger, Washington, D. C., also entered an appearance for intervenor Texas Gas Transmission Corp. in Nos. 24517 and 24518.

Mr. Reuben Goldberg, Washington, D. C., entered an appearance for petitioner in No. 24602.

Mr. Charles F. Wheatley, Jr., Washington, D. C., was on the brief for intervenor American Public Gas Assn. in No. 24518.

Before FAHY, Senior Circuit Judge, and ROBINSON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

These two sets of cases, consolidated for review, involve a determination as to the impact of Section 441(a) of the Tax Reform Act of 1969,[1] relating to the methods of depreciation for regulated utilities, on two types of utility property: (1) post-1969 expansion property and (2) pre-1970 and post-1969 non-expansion property.[2] The impact of Sec-

1. Int.Rev.Code of 1954, § 167(*l*), as amended Publ.L. 90–26, §§ 1, 2(b), 81 Stat. 57, 58 (1967); Publ.L. 91–172, § 521(a), (d), 83 Stat. 625, 649, 653 (1969).

2. Section 441(a) of the 1969 Tax Reform Act defines "pre-1970" property as "property which was public utility property in the hands of any person at any time before January 1, 1970." Int.Rev.Code of

tion 441(a) on post-1969 expansion property—the subject of FPC Orders No. 404 and 404–A, issued, respectively, 15 May 1970 and 9 July 1970, and cases no. 24,-518 and 24,602 here—will be considered first, followed by a determination of its effect on pre-1970 and post-1969 non-expansion property—the subject of FPC Opinions No. 578 and 578–A and accompanying orders, issued 3 June 1970 and 21 July 1970, respectively, and cases no. 24,517 and 24,632 here.

## I.

### A.

Congress specifically provided for the proper depreciation treatment of post-1969 utility expansion property in Section 441(a) of the Tax Reform Act of 1969 as follows:

(A) *Election as to new property representing growth in capacity.*—If the taxpayer makes an election under this subparagraph within 180 days after the date of the enactment of this subparagraph in the manner prescribed by the Secretary or his delegate, in the case of taxable years beginning after December 31, 1970, paragraph (2)(C) [concerning liberalized depreciation with flow-through] shall not apply with respect to any post-1969 public utility property, to the extent that such property constitutes property which increases the productive or operational capacity of the taxpayer with respect to the goods or services described in paragraph (3)(A) and

does not represent the replacement of existing capacity.[3]

■■ This provision indicates that Congress intended to, and did, prescribe specifically the appropriate tax depreciation treatment for post-1969 expansion property of utilities such as is involved in the cases here. It permits a regulated utility such as Texas Gas Transmission Corporation, an intervenor in these cases, to make an election, within 180 days after enactment of this provision, *not* to have liberalized depreciation with flow-through[4] apply with respect to its post-1969 expansion property. That is, such a method would no longer be considered a "reasonable allowance" for tax depreciation purposes within the meaning of the Internal Revenue Code of 1954.[5]

The legislative history accompanying Section 441(a) of the 1969 Tax Reform Act supports this interpretation. The report of the Senate Finance Committee states in relevant part:

The [Senate] committee amendments, while in most respects the same as the House provisions, differ in one principal area. The amendments permit an election to be made within 180 days after the date of enactment of the bill for a utility covered by this provision to shift from the flow-through to the straight-line method, *with or without the permission of the appropriate regulatory agency, or permit it with the permission of the regulatory agency to shift to the normalization method* (that is, come under general rules of the bill).

1954, § 167(*l*) (3) (B). Property which is not pre-1970 is considered "post-1969" property. Int.Rev.Code of 1954. § 167(*l*) (3) (C). "Expansion" property is the term employed to denote that property "which increases the productive or operational capacity of the taxpayer," while "non-expansion" property refers simply to that property which replaces the existing plant of a taxpayer. Int.Rev. Code of 1954 § 167(*l*) (4) (A).

3. Int.Rev.Code of 1954, § 167(*l*)(4)(A).

4. By utilizing liberalized depreciation in computing its income tax, a utility ob-

tains a larger deduction, and thus pays less income tax, at least initially, and, in the case of expanding or steady plants, overall, than it would if it used straight-line depreciation. Under the "flow-through" method of liberalized depreciation, a utility is allowed to recoup from its customers by means of its rates only the taxes it *actually* pays; under "normalization," however, it is allowed to recoup the higher taxes it would pay (but actually does not) if it were using straight-line depreciation.

5. Int.Rev.Code of 1954, § 167(*l*)(2)(C).

*This election applies both as to new and existing property. . . .* Since the company would no longer be permitted to use accelerated depreciation (unless the agency later permits it to normalize), the agency would not be able to impute the use of accelerated depreciation with flow-through.[6]

In conference, the *election right was restricted to apply only to post-1969 expansion property.* As the Conference Report indicates:

The conference substitute (sec. 441 of the substitute and sec. 167(*l*) of the code) *follows the Senate amendment except that* the special provision referred to in (e) above is stricken and *the 180-day election (item (d), above) is modified to apply to new property and not to replacement property.* Even in the case of new property, however, the right to change over from the flowthrough method is to be available only to the extent the new property increases the productive or operational capacity of the company.[7]

 It is clear, then, that Congress intended to, and did in fact, provide regulated utilities such as Texas Gas with an option to abandon flow-through for rate-making purposes in regard to post-1969 expansion property and substitute in its place either (1) straight-line depreciation, with or without the permission of the relevant regulatory agency or (2) accelerated depreciation with normalization,[8] with the permission of the appropriate regulatory agency. It is also clear that Congress intended thereby to preclude regulatory agencies from imputing flow-through to any regulated utility exercising this election with respect to its post-1969 expansion property.[9]

### B.

█ The basic issue in this set of cases, therefore, is whether the FPC was correct in its Orders No. 404 and 404–A in interpreting the Tax Reform Act of 1969 as depriving it of the power to impute the use of liberalized depreciation with flow-through for rate-making purposes to a utility making the election under Section 441(a)[10] to abandon flow-through with respect to its post-1969 expansion property. Clearly, it is the duty of the FPC, under its Congressional

---

6. S.Rep. No. 552, 91st Cong., 1st Sess. 173–74 (1969) (emphasis added).

7. Conf.Rep. No. 782, 91st Cong., 1st Sess. 312–13 (1969) (emphasis added).

8. Under normalization, taxes for *ratemaking purposes* are determined on the basis of straight-line depreciation, while for *tax purposes* liberalized depreciation is used. The difference between the taxes which would be payable under straight-line depreciation and the taxes payable under liberalized depreciation is placed into a deferred tax reserve account by the taxpayer. The FPC requires that this reserve account be deducted from the rate base. Accordingly, the rates charged customers are lower by the amount of the return on this reserve account which would otherwise be charged if the reserve account were not deducted from the rate base.

9. As the Senate Finance Committee Report states with respect to a company exercising its right to abandon flow-through under the 180-day election provision,

" . . . Since the company would no longer be permitted to use accelerated depreciation (unless the agency later permits it to normalize), *the agency would not be able to impute the use of accelerated depreciation with flow-through.*" [See note 6, *supra*, at 174 (emphasis added)] While the availability of the 180-day election option was subsequently limited in conference to apply only to post-1969 utility expansion property, the Conference Report stated that "[t]he conference substitute (Sec. 441 of the substitute and Sec. 167(*l*) of the code) *follows the Senate amendment* except that "the 180-day election . . . is modified to apply to new property and not to replacement property." [See note 7, *supra* (emphasis added).] This indicates that the Senate rationale, cited above, is controlling as to post-1969 expansion property, thus preventing the Commission from imputing liberalized depreciation with flow-through to Texas Gas' post-1969 expansion property.

10. See note 3, *supra.*

mandate, the Natural Gas Act,[11] to ensure the continued availability of natural gas in interstate commerce for eventual sale to consumers at the lowest practicable rate. As the Fifth Circuit had occasion to observe:

> The central principle in the regulation of the natural gas industry around which all ratemaking revolves is
>
> "the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption . . . at the lowest possible reasonable rate·consistent with the maintenance of adequate service on the public interest".
>
> This is the language of Section 7(c) of the Natural Gas Act as originally enacted in 1938. The provision was deleted when the subsection was amended in 1942 but, as the Supreme Court has held, the amendment was not intended to change the congressional purpose of the Act; the "primary aim of this legislation was to protect consumers against exploitation at the hands of natural gas companies." Federal Power Commission v. Hope Natural Gas Company, 1944, 320 U.S. 591, 611, 64 S.Ct. 281, 291, 88 L.Ed. 333. . . . Again, as Justice Clark reiterated twenty-five years later: "The Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges". Atlantic Refining Company v. Public Service Commission, 1959, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312. . . .[12]

■■ However, the FPC may not remain oblivious to the wishes of Congress as expressed in forms other than amendments to or deletions from the Natural Gas Act. By means of Section 441(a) of the 1969 Tax Reform Act, Congress has provided regulated utilities such as Texas Gas with an absolute right of election to abandon flow-through with respect to their post-1969 expansion property. Furthermore, we do not have the situation presented in Alabama-Tennessee Natural Gas Co. v. FPC, *supra*, where the court was able to find "no evidence that at the time Section 167 [of the Internal Revenue Code] was enacted Congress even focused on the problem in terms of reducing the dimensions of the Federal Power Commission's regulatory responsibility to protect consumers from excessive rates. . . . "[13] Rather, investigation of the legislative history regarding Section 441(a) of the Tax Reform Act of 1969 reveals that Congress was well aware of the implications of permitting regulated utilities an election to abandon liberalized depreciation with flow-through with respect to their post-1969 expansion property.[14] As such, the FPC was not remiss in the performance of its statutory duty in permitting Texas Gas to abandon flow-through in regard to its post-1969 expansion property, as expressly provided by the language of Section 441(a) of the 1969 Tax Reform Act.

## C.

■ The FPC's Orders No. 404 and 404–A, indicating that it would continue the policy adopted in *Alabama-Tennessee Natural Gas Co.*,[15] of deducting the amounts in the accrued deferred tax account from the rate base and not considering such balances as part of capitalization in rate proceedings before it,

---

11. 15 U.S.C. §§ 717–717w (1954).

12. Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, 359 F.2d 318, 331 (5th Cir.), cert. denied 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966).

13. *Id.*, at 332. As the court also observed "Occam's razor slices through the arguments based on legislative history and congressional intent. Either Congress did not consider the concrete problem the case presents or, if it did, Congress decided to let sleeping dogs lie." [*Id.*, at 335]

14. See notes 6 & 7, *supra*.

15. 31 FPC 208, modified 31 FPC 928 (1964), aff'd sub nom., Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, see note 12, *supra*.

is a statement of policy based essentially on an interpretation of Section 441(a) of the 1969 Tax Reform Act. Thus, under the pertinent provisions of the Administrative Procedure Act,[16] it was properly issued without notice or opportunity for hearing, since it was not the result of a rulemaking proceeding.

While Memphis Light contends that Orders No. 404 and 404–A of the Commission denied them the benefits of liberalized depreciation with flow-through accounting and ratemaking in regard to their post-1969 expansion property, they misdirect their attack. Instead of the Commission's orders here, what resulted in the denial of liberalized depreciation with flow-through was the election by Texas Gas to abandon such depreciation, as it was specifically entitled to do under Section 441(a) of the 1969 Tax Reform Act. Texas Gas made this election in a letter to the Commissioner of Internal Revenue dated 8 June 1970, a copy of which was transmitted to the FPC dated 10 June 1970. At this juncture, the *only* options available to the Commission were either to do nothing and thereby leave Texas Gas on straight-line depreciation or to permit it to use liberalized depreciation with normalization. The FPC chose the latter.

The Commission's Orders No. 404 and 404–A, then, were nothing more than statements of FPC policy interpreting the mandate of Congress as expressed in Section 441(a) of the Tax Reform Act of 1969. As such, they were clearly exempt from the notice and opportunity for hearing requirements for rulemaking provided under the Administrative Procedure Act. While it is true that the FPC's interpretative rulings here may have significant economic consequences on Memphis Light and other ratepayers in the long run, such a statement of policy is specifically exempted by the Administrative Procedure Act from the need for prior notice or opportunity for a hearing:

> Except when notice or hearing is required by statute [not relevant here], this subsection does not apply—(A) to interpretative rules, *general statements of policy*, or rules of agency organization, procedure, or practice. . . .[17]

## D.

▮ The case law does not support the petitioners' assertion that notice and opportunity for hearing were required in this set of cases—24,518 and 24,602. While interested parties might argue the validity of the FPC's interpretation of Congressional purpose as expressed in Section 441(a) of the Tax Reform Act of 1969, such an opportunity is not required by the Administrative Procedure Act prior to issuance of such interpretations by an administrative agency.[18]

The petitioners' argument that the FPC, as a result of the issuance of its Orders No. 404 and 404–A, has changed its policy in *Alabama-Tennessee Natural Gas Co.*, is incorrect. Only those utilities that made the election provided by Section 441(a) of the 1969 Tax Reform Act to abandon flow-through with respect to their post-1969 expansion property are affected by the Commission orders here at issue. The case of *Texaco, Inc. v. FPC*[19] is inapposite, since the switch from simple to compound interest which the Commission ordered in that case was one involving consideration of, *inter alia*, current interest rates and trends, the impact on individual companies and the effect of increased contingent liabilities on the ability of the companies affected to acquire new equity or debt capital. In contrast, the instant set of cases, aside from the question of the validity of the FPC's interpretation of Section 441(a) of the 1969 Tax Re-

16. 5 U.S.C. § 553(b) (3) (A) (1966).

17. *Id.* (emphasis added).

18. See *Id.;* also, Gibson Wine Co. v. Snyder, 90 U.S.App.D.C. 135, 194 F.2d 329 (1952) ; Garelick Manufacture Co. v. Dillon, 114 U.S.App.D.C. 218, 313 F.2d 899 (1963).

19. 412 F.2d 740 (3rd Cir. 1969).

form Act, involved no need for further consideration by the Commission as to what regulatory policy would result in a lower rate for Memphis Light and other ratepayers. The impact of liberalized depreciation with normalization as opposed to that of straight-line depreciation—the only choice open to the FPC under the election provision for regulated utilities such as Texas Gas contained in Section 441(a) of the 1969 Tax Reform Act, had already been fully considered and resolved in prior cases in favor of liberalized depreciation with normalization.[20]

■ The other principal case relied upon by the petitioners here, National Motor Freight Traffic Association v. United States,[21] is likewise inapposite. In that case, the Interstate Commerce Commission, after Congress had vested reparations authority in the courts in cases involving motor carriers, had announced an informal process for restoring to shippers past charges which were currently agreed by the carrier to have been illegal. This procedure did not relate to any substantive power specifically granted the ICC and the court in that case held that a rulemaking process was required to ascertain whether such authority existed in the first place and, if so, whether it should be exercised. In such a situation, unlike that presented by the set of cases at hand, the creation of procedures was an integral part of a substantive determination that could not be made without notice and opportunity for hearing. Here, however, since the only option open to the FPC was a choice between leaving a utility electing to abandon flow-through with respect to its post-1969 expansion property under Section 441(a) of the 1969 Tax Reform Act on straight-line depreciation, permitting it to use liberalized depreciation with normalization, there was no need for prior notice or a hearing. Prior decisions of the Commission had already resolved this issue in favor of liberalized depreciation with normalization.[22]

## II.

The second set of cases—24,517 and 24,632—involves the validity of the FPC's decision in its Opinions No. 578 and 578-A and accompanying orders, permitting Texas Gas to change from liberalized depreciation with flow-through to such depreciation with normalization in regard to its pre-1970 and post-1969 *non*-expansion property.

Section 441(a) of the Tax Reform Act of 1969 amended the Internal Revenue Code of 1954 by adding subsection (1), "Reasonable allowance in case of property of certain utilities," to Section 167 of the IRC. Section 441(a) distinguishes between two types of utility property: (1) pre-1970 and post-1969 non-expansion property and (2) post-1969 expansion property. With respect to the latter type, Section 441(a) permits utilities using liberalized depreciation with flow-through to elect within 180 days of the enactment of Section 441(a) to shift either to straight-line depreciation of their own volition or to liberalized depreciation with normalization with the permission

20. See Northern Natural Gas Co., 25 FPC 431 (1961), in which the Commission found that the use of liberalized depreciation with normalization provided tax benefits not available under straight-line depreciation. These benefits were shared with the ratepayers if a less-than-normal or zero rate of return was allowed on the tax reserve or if it was completely deducted from the company's rate base (as here) [25 FPC at 438-441]. In addition, the Commission in the instant set of cases, in denying petition for rehearing, stated: The use of straight-line depreciation eliminates the possibility of tax defer-

rals to natural gas pipeline companies. On the other hand, liberalized depreciation with normalization may generate substantial tax deferrals. *The benefits of these tax deferrals are shared*, although admittedly not necessarily in equal proportions, *by the company and its customers* by treating such amounts as rate base deductions. [44 FPC 16 (1970) (emphasis added)]

21. 268 F.Supp. 90 (D.D.C., three judges, 1967), aff'd 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968).

22. See note 20, *supra.*

of the appropriate regulatory agency. Texas Gas exercised this option with respect to its post-1969 expansion property and received the FPC's permission to employ liberalized depreciation with normalization—the validity of which is treated in I., above.

In the instant set of cases, the determination of whether the FPC was correct in permitting Texas Gas to shift from liberalized depreciation with flow-through to similar depreciation with normalization with respect to its pre-1970 and post-1969 non-expansion property requires, first, a review of Section 441(a) and its legislative history to ascertain the intent of Congress here and, second, a consideration of the validity of the Commission's decision in light of this Congressional intent.

## A.

Section 167(a) of the Internal Revenue Code of 1954 [23] provides that a taxpayer is entitled to a "reasonable allowance" for a tax depreciation deduction. Section 441(a) of the 1969 Tax Reform Act specifies the appropriate methods for computing this "reasonable allowance" for pre-1970 and post-1969 non-expansion property in the case of regulated utilities such as Texas Gas. Under Section 441(a), a "reasonable allowance" may be computed in either of two ways: one, a "subsection (l) method," refers to the straight-line method of depreciation, while the other is "the applicable 1968 method for such property," but "only if the taxpayer uses a normalization method of accounting." [24] Section 441(a), however, provides an exception to the normalization requirement for using the second method by allowing a utility using the flow-through method to continue doing so.[25]

The right conferred on regulated utilities such as Texas Gas by Section 441(a) of the 1969 Tax Reform Act to make an election within 180 days of the enact-

ment of Section 441(a) to shift from liberalized depreciation with flow-through to either straight-line depreciation or, with the approval of the appropriate regulatory agency, liberalized depreciation with normalization with respect to their post-1969 expansion property, as discussed in I., *supra,* does not, however, apply to pre-1970 and post-1969 *non*-expansion property.

■ The legislative history accompanying the enactment of Section 441(a) clearly reveals the intent of Congress that the right of election provided utilities to shift from liberalized depreciation with flow-through either to straight-line or to liberalized depreciation with normalization be confined simply to post-1969 expansion property. While the progress of Section 441(a) through both houses of Congress and in conference reveals the existence of differences as to what types of property should be made eligible under the election provision, *the final version of the bill limits the applicability of the right of election to post-1969 expansion (non-replacement) property alone.*

At the first stage, the House Report indicated:

> Your committee's bill provides that, in the case of *existing* property, the following rules are to apply:
>
> (1) If straight line depreciation is presently being taken, then no faster depreciation is to be permitted as to that property.
>
> (2) If the taxpayer is taking accelerated depreciation and is "normalizing" its deferred taxes, then it must go to the straight line method unless it continues to normalize as to that property.
>
> (3) If the taxpayer is taking accelerated depreciation and is flowing through to its customers the benefits of the deferred taxes, then the

---

23. Int.Rev.Code of 1954, § 167(a), ch. 736, 68A Stat. 51, as amended Publ.L. 89-800, § 2, 80 Stat. 1513 (1966).

24. See note 1, *supra,* at § 167 (l) (3) (A).

25. *Id.,* at § 167(l) (3) (B).

taxpayer must continue to do so, unless the appropriate regulatory agency permits a change as to that property. U.S.Code Cong. & Admin. News, p. 1783.[26]

Thus, under the House version of the bill, Texas Gas, since it had been using accelerated depreciation with flow-through, would have been required to continue doing so with respect to its "existing" (including replacement) property unless the Commission permitted otherwise. If this had been the law enacted, the Commission's and Texas Gas' position here would have been clearly justified. But, as we shall see, the law actually passed was significantly changed.

The bill as reported by the Senate Finance Committee gave regulated utilities using liberalized depreciation with flow-through an election to abandon that method of depreciation both for "pre-1970" property (a change from "existing" property in the House version) and "post-1969" property ("other" property in the House bill). The Senate Report states in regard to the altered right of election:

> The [Senate] committee amendments, while in most respects the same as the House provisions, differ in one principal area. The amendments permit an election to be made within 180 days after the date of enactment of the bill for a utility covered by this provision to shift from the flow-through to the straight-line method, with or without the permission of the appropriate regulatory agency, or permit it with the permission of the regulatory agency to shift to the normalization method (that is, to come under general rules of the bill). This election applies both as to new and *existing* property. U.S.Code Cong. & Admin.News p. 2206.[27]

Under the Senate version of the bill, therefore, Texas Gas would have been permitted to shift from liberalized depreciation with flow-through either to straight-line depreciation or, with the FPC's approval, to liberalized depreciation with normalization.

However, in conference, it was agreed that this right of election would be restricted to apply to post-1969 *expansion property only.* The Conference Report states:

> 1. *Depreciation allowed regulated industries (sec. 167 of the code)*
>
> The House bill provides that in the case of certain regulated industries (the furnishing or sale of . . . gas through a local distribution system, . . . and transportation of gas by pipeline) a taxpayer is *not permitted* to use accelerated depreciation *unless it "normalizes"* the current income tax reduction resulting from the use of such accelerated depreciation. . . .
>
> *This rule is not to apply in the case of a taxpayer that is at present flowing through the tax reduction to earnings for purposes of computing its allowable expenses on its regulated books of account. Also, if the taxpayer is now using straight line depreciation as to any public utility property it may not change to accelerated depreciation as to that property.*
>
> The Senate amendment makes the following changes in the House bill: . . . (d) *an election is permitted to be made within 180 days after the date of enactment by a company at present on flowthrough to come under the rules of the bill . . . .*
>
> *The conference substitute (sec. 441 of the substitute and sec. 167(l) of the code) follows the Senate amendment except that the special provision referred to in (e) above is stricken and the 180-day election (item (d), above) is modified to apply to new property and not to replacement property. Even in the case of new property, however, the right to change over from the flow-through method is to be available only to the extent the new property increas-*

---

26. H.R.Rep. No. 413 [To Accompany H.R. 13270], 91st Cong., 1st Sess. 132–33 (1969) (emphasis added).

27. See note 6, *supra* (emphasis added).

*es the productive or operational capacity of the company.* U.S.Code Cong. & Admin.News, p. 2427.[28]

Thus, Texas Gas is unable to invoke the election provision of Section 441(a) to abandon liberalized depreciation with flow-through with respect to its "existing" (including replacement) property for two reasons: first, since Texas Gas has been employing liberalized depreciation with flow-through, it is specifically prohibited, under the final version of the bill, from abandoning such depreciation (see the second paragraph of the Conference Report, *supra*); and, second, since the right of election was restricted to apply to post-1969 expansion property *only*, Texas Gas may not seek to circumvent this restriction by applying it to its pre-1970 and post-1969 *non*-expansion property—the subject of this set of cases (24,517 and 24,632).

What the Commission does by its decision in this set of cases, then, is to produce an effect precisely contrary to that envisioned by Congress in enacting the Tax Reform Act of 1969. This effect was considered by Congress in its deliberations on the appropriate scope for the right of election provided by Section 441 (a), both in terms of its impact on rates and on tax revenues, and was specifically rejected. The Report of the House Committee on Ways and Means states:

> Consideration has been given to suggestions by the Federal Power Commission and others that regulated utilities no longer be permitted to use a method of depreciation other than straight line. However, your committee concluded that, in too many cases, this would place regulated utilities at an unfair competitive disadvantage, both in terms of the sale of their products or services and their attractiveness to equity investors. Also, this would result in prompt, substantial, and widespread utility rate increases.

*Accordingly, your committee has determined in general to "freeze" the current situation regarding methods of depreciation in the case of those companies in what are, by and large, the more healthy utility industries.*[29]

The Senate Report agreed with this perspective, stating in relevant part:

> Accordingly, the committee agrees with the House that it is *appropriate to in general* [sic] *"freeze" the current situation regarding methods of depreciation* in the case of those companies in what are, by and large, the more flourishing utility industries. U.S.Code Cong. & Admin.News, p. 2204.[30]

The Senate Report, agreeing that a company using straight-line depreciation with normalization could not shift to flow-through under the bill, stated, with specific reference to utility companies such as Texas Gas which have been using liberalized depreciation with flow-through, "[o]ther companies—those that now flow through, as well as those in other regulated industries—are not limited by this general rule of the bill." [31]

Also, as the Summary of the Bill, prepared by the staffs of the Joint Committee on Internal Revenue Taxation and the Committee on Finance, observes with respect to the impact of Section 441(a) on revenues as well as rates:

> The bill substantially forestalls the entire revenue loss that the continuation of existing trends would have made almost inevitable. It does so in a way that (with very few exceptions) will require no increase in utility rates because of the tax laws, since by and large, it merely takes the various regulatory situations as it finds them and freezes those situations.[32]

There is nothing in the Tax Reform Act of 1969, then, which modifies the Commission's duty under the Natural Gas Act to require regulated utility com-

28. See note 7, *supra* (emphasis added).

29. See note 26, *supra* (emphasis added).

30. See note 6, *supra* (emphasis added).

31. *Id.*, at 174.

32. Summary of the Bill, prepared by the staff of the Joint Committee on Internal Revenue Taxation and the Committee on Finance, at 73.

panies such as Texas Gas, which had been using liberalized depreciation with flow-through with respect to their pre-1970 and post-1969 non-expansion property, to set rates which reflect actual expenditures alone with respect to such property. According to Congress, the only appropriate tax allowance for rate-making purposes for a company such as Texas Gas, which has been using liberalized depreciation with flow-through with respect to its pre-1970 and post-1969 non-expansion property, is the income taxes actually paid.[33]

### B.

The FPC has argued that there is nothing in this Tax Reform Act indicating an intent on the part of Congress to alter the Commission's power to exercise its informed judgment as to what method of accounting can properly serve as the basis of ratemaking, and to weigh the cost to the consumer and the necessity to preserve a viable industry. The FPC urges that had Congress had such an intent, Congress would have manifested it by an amendment to the Natural Gas Act, not to a Revenue Act.

This overlooks the undeniable fact that methods of calculating depreciation are relevant both for taxation and ratemaking purposes. Congress here dealt with depreciation in the context of a revenue measure, but all its deliberations—particularly the committee reports of both houses, the conference committee report, and most significantly, the changes made in the bill at different stages—show its keen awareness of the measure's impact on the federal revenue, the natural gas industry, and the consumers. It may well be that some of the FPC's regulatory discretion has been lost by the enactment of this law; in effect, Congress has pondered the question, and has exercised what formerly was the FPC's prerogative for it. The fact that Congress did so in the context of a Tax Reform

33. In a recent analogous case, the California Supreme Court held that Pacific Telephone and Telegraph Company's refusal, despite the fact that the California Public Utilities Commission was imputing accelerated depreciation with flow-through to those utilities which, like Pacific Telephone, used straight-line depreciation, to abandon straight-line depreciation (even though this meant a higher tax burden for Pacific Telephone in light of its expanding plant) [See p. 123 of 6 Cal.3d, p. 287 of 98 Cal.Rptr., p. 799 of 490 P.2d] was an "imprudent management decision" which it should not be permitted to pass on to its customers by means of higher rates. As the court there noted,

. . . [I]t is clear that requiring ratepayers to put up the capital for the telephone system is contrary to the basic principle of utility rate setting. The basic principle is to establish a rate which will permit the utility to recover its cost and expenses plus a reasonable return on the value of property devoted to public use. . . . By permitting Pacific to include in its costs a charge for federal taxes greatly in excess of its actual federal tax expense, the commission is deviating from this basic principle. We realize that the 1968 commission decision also deviated from the basic principle by refusing to permit Pacific to include in its costs all of its

tax expense, but this deviation was based on Pacific's imprudent management.

It should also be pointed out that the effect of the instant decision [of the Commission below] is to reward Pacific for its imprudent management as compared to other utilities which prudently had adopted accelerated depreciation and flow-through prior to August, 1969. Apparently, these utilities will continue to be required to flow-through the benefits of accelerated depreciation to the ratepayers, where as Pacific will be allowed to use accelerated depreciation [under the Commission's decision below] without requiring flow-through, thus retaining most of the benefits for itself.

In the circumstances, we are satisfied that, in the light of Pacific's past imprudence, the commission could reasonably have ordered Pacific to continue the accounting practices established in the 1968 decision and that the commission abused its discretion in expressly *refusing to consider* imputed acceleration depreciation and flow-through as established in the 1968 decision.

City and County of San Francisco v. Public Utilities Commission et al., & Consumers Arise Now et al. v. Public Utilities Commission, 6 Cal.3d 119, p. 129, 98 Cal. Rptr. 286, p. 291, 490 P.2d 798 p. 803 (emphasis in original).

Act cannot vitiate what Congress enacted.

To hold otherwise would be to rule that the carefully considered changes, granting an election to the company with respect to its expansion property but eliminating any choice by either company or FPC with respect to the company's *non*-expansion property,[34] were meaningless. The rule here urged by the FPC and Texas Gas is similar to that policy proposed by Chairman White, and this was rejected.[35] We here give effect to what Congress did; albeit cloaked in a revenue act, a statutory mandate in regard to the calculation of depreciation has an effect on the FPC's power to exercise its independent judgment as to what best will serve industry and consumers.

Our holding, however, should not be taken to mean that Section 441(a) of the Tax Reform Act of 1969 deprives the Commission in all cases of its discretion under the Natural Gas Act to permit utilities to abandon flow-through. There might be extraordinary circumstances in which Section 441(a), taken in conjunction with the mandate of the Natural Gas Act, should not be construed to prevent the FPC in its underlying responsibility of protecting consumer interests *from finding that those interests would* be furthered by permitting the abandonment of flow-through. It is clear, however, that such consumer interests would not be furthered by permitting Texas Gas to abandon flow-through in the circumstances presented by the case at bar.

### III.

Accordingly, the decision of the Federal Power Commission in its Orders No. 404 and 404–A with respect to the post-1969 *expansion* property of Texas Gas— the subject of cases no. 24,518 and 24,602 —is affirmed. However, the action of the Commission in its Opinions No. 578 and 578–A and accompanying orders in regard to Texas Gas' pre-1970 and post-1969 *non*-expansion property—the subject of cases no. 24,517 and 24,632—is

vacated and remanded to the Commission for action in accordance with this opinion.

So ordered.

### ON PETITIONS FOR REHEARING

Petitions of the Federal Power Commission and Texas Gas Transmission Corporation, an intervenor, for rehearing and suggestions for rehearing *en banc*, of this court's action in vacating the order of the Commission with respect to Texas Gas' pre-1970 and post-1969 *non*-expansion property, focus on three main points:

1. Whether Congress' enactment of the 1969 Tax Reform Act limited the extent of the Commission's authority to permit regulated utilities such as Texas Gas to shift from accelerated depreciation with flow-through to similar depreciation with normalization with respect to their pre-1970 and post-1969 *non*-expansion property.

2. The import of the explanation of Section 441(a) of the 1969 Tax Reform Act in regard to point 1, *supra*, provided by the Staff of the Joint Committee on Internal Revenue Taxation.

3. The court's caveat, at the end of its opinion, with respect to the effect of Section 441(a) of the Act on the Commission's discretion to permit regulated utilities such as Texas Gas to abandon flow-through.

We deny the petitions for rehearing, as we find the Commission's and Texas Gas' arguments unpersuasive. Since both manifest some confusion over the meaning of our opinion and what we deem the proper interpretation of the statute involved, we set forth these additional views on the specific points raised in an effort at clarification for the responsible regulatory agency and the industry involved.

I. *The Extent of the Commission's Authority under Section 441(a) of the 1969 Tax Reform Act re Non-Expansion Property*

The Commission and Texas Gas return to the initial House version of Section

---

34. See notes 3 and 28, *supra*.

35. See note 26, *supra*.

441(a) of the 1969 Tax Reform Act to support their contention that Section 441 (a), as finally enacted, did not curtail the Commission's discretion, with respect to pre-1970 and post-1969 *non*-expansion (existing or replacement) property, to permit regulated utilities such as Texas Gas to shift from accelerated depreciation with flow-through to similar depreciation with normalization. They point out (we do not disagree, see first full paragraph of text, page 862) that the House version would have permitted Texas Gas, with the Commission's approval, to shift from flow-through to normalization with respect to its pre-1970 and post-1969 *non*-expansion (as well as its post-1969 expansion) property.

It is at the Senate stage of the proceedings that our views diverge. Tex-as Gas and the Commission argue that the FPC's discretion to permit a regulated utility such as Texas Gas to shift its depreciation treatment of *non*-expansion property survived through both the Senate and Conference Committee versions of the legislation. Their interpretation is that subsequent versions reflect *additional* provisions (*e. g.*, the 180-day period during which the company may elect to change its method of depreciation) rather than *substitute* provisions which eventually made up the final bill. We think our analysis (pp. 861–863) of the changes at different stages of the legislation makes clear why this contention is not valid, but for greater clarity we shall chart the transformations as the Tax Reform Act progressed through the legislative stages.

| House Version Envisioned Three Possible Present Situations re both expansion and non-expansion Property Depreciation | House Version Proposed These Permissible Changes, with No Time Limit re Changes | Senate Version Envisioned Same Three Present Situations, but (1) Created Under III A Difference In Agency Approval Required; and (2) Limited Either Change to a 180-Day Election Period | Conference Committee Version |
|---|---|---|---|
| I. Straight-line | None allowed | (Same) | (Same) |
| II. Normalization | To straight-line, or continue normalization, *without* agency approval (could *not* change to flow-through) | (Same) | (Same) |
| III. Flow-through | Continue flow-through, unless change to Straight-line, *with* agency approval; or<br><br>Normalization, *with* agency approval | Continue flow-through, unless change to<br>A. Straight-line, *without* agency approval; or<br>B. Normalization, *but only with* agency approval,<br>Either change to be elected within 180 days. | Same as Senate, but *modified* to make the 180-day election (item (d) in Conf. Rep.) apply to *new* (post-1969) property *only*, and available only to extent productive capacity increased. |

For legislative history supporting this analysis, see: H. R. Rep. No. 413 [To Accompany H.R. 13270], 91st Cong., 1st Sess. 131–134 (1969); S. Rep. No. 552 [To Accompany H.R. 13270], 91st Cong., 1st Sess. 171–176 (1969); Conf. Rep. No. 782, 91st Cong., 1st Sess. 312–313 (1969), U.S.Code Cong. & Admin.News, p. 1645.

Thus, between the initial House and Senate versions of Section 441(a), two differences emerge with respect to Situation III and to shifting from flow-through: First, under the Senate version, in contrast to the House, FPC approval is *not* required to shift from the flow-through to the straight-line method; and, second, the Senate limited (the Commission and Texas Gas can point to no language to the contrary) *all* changes re both expansion and *non*-expansion property to a 180-day election period. In view of these differences, the Conference Committee was free to modify the House and Senate versions in an attempt to resolve them.[1] Neither Texas Gas nor the Commission dispute the power of the conferees to make the second change, to curtail the 180-day election provision so as to apply *only* to post-1969 expansion property.

As to the first change, there was clearly a disagreement between the Senate and the House over the right of a regulated utility to shift from accelerated depreciation with flow-through to straight-line depreciation, with or without agency approval. This disagreement entitled the conferees (1) to choose the Senate version, limiting all shifting from the flow-through method to a 180-day period, *and (2) to make it applicable to post-1969 expansion property only.* Clearly, such an option is a "germane modification of subjects in disagreement"—here the permissible extent of abandonment of accelerated depreciation with flow-through.

The variety and extent of differences between the two versions was acknowl-

edged by the Staff of the Joint Committee on Internal Revenue Taxation,[2] a source much relied upon here by the Commission and Texas Gas: "The Tax Reform Act of 1969, because of its comprehensive scope and because of the *many changes* which were made in this legislation, both by the Senate *and subsequently by the conferees*, is an illustration where the differences [between the versions of each House] were especially significant." [3]

In permitting a taxpayer such as Texas Gas to shift from accelerated depreciation with flow-through to straight-line depreciation with or without the appropriate agency's approval, the Senate was no doubt interested in increasing governmental revenues (since under flow-through the tax reduction is passed on to the utility's customers). The House, however, by limiting changes from flow-through either to straight-line or normalization *only with* agency approval, was reflecting the concern that emphasis on a shift to straight-line depreciation, as expressed by the Senate version, would place taxpayers such as Texas Gas at a competitive disadvantage, both as to the sale of their products or services and as to their attractiveness to equity investors.[4]

Thus, the conferees' resolution of this disagreement in favor of the latter concern by limiting the extent to which regulated utilities may abandon flow-through reflects Congress' overall intent "in general to 'freeze' the current situation regarding methods of depreciation in the case of those companies in what are, by and large, the more healthy utility in-

---

1. Section 136 of the Legislative Reorganization Act of 1946, 2 U.S.C. § 190c(a), provides in pertinent part:
 (a) In any case in which a disagreement to an amendment in the nature of a substitute has been referred to conferees, it shall be in order for the conferees to report a substitute on the same subject matter; but they may not include in the report matter not committed to them by either House. *They may, however, include in their report in any such case matter which is a ger-*

mane modification of subjects in disagreement (emphasis supplied).

2. As stated in the Letter of Transmittal in their General Explanation of the Tax Reform Act of 1969, H.R. 13270, 91st Congress, Public Law 91–172 (3 December 1970).

3. At p. III (emphasis added).

4. H.R.Rep.No.413 [To Accompany H.R. 13270], 91st Cong., 1st Sess. 132 (1969), U.S.Code Cong. & Admin.News, p. 1645.

dustries." [5] And, as both the House and Senate Reports indicate, "About half the regulatory agencies require utilities that use accelerated depreciation for tax purposes to 'flow through' the resulting reduction in Federal income taxes currently to the utilities' customers. . . . Some agencies insist that utilities subject to their jurisdiction use accelerated depreciation for tax purposes; even if those utilities use straight line depreciation for tax purposes, such agencies treat them for ratemaking purposes as though they had reduced their Federal income tax expense by using accelerated depreciation." [6]

This overall congressional objective to forestall prospective revenue losses, without handicapping the utility industry, was a prime consideration at all stages of the legislation. In focusing on the specific language of the House version of the bill, Texas Gas and the Commission give no notice to this overall objective, the weight it had at all stages, and how the final conferees' changes reflect this, although we stressed this in our opinion (pp. 862–864).

II. *Import of the General Explanation by the Staff of the Joint Committee on Internal Revenue Taxation.*

Reliance by the Commission and Texas Gas on one specifically cited portion of the General Explanation of the Tax Reform Act of 1969, H.R. 13270, 91st Congress, Public Law 91–172, prepared by the Staff of the Joint Committee on Internal Revenue Taxation (3 December 1970), for support for the proposition that Section 441(a) of the Act as finally enacted did not diminish the Commission's authority to permit a taxpayer such as Texas Gas from abandoning flow-through with respect to its pre-1970 and post-1969 *non*-expansion property is mistaken. We are cited to page 151 of the *General Explanation,* to wit:

More specifically, in the case of *existing* property the following rules apply:

\* \* \* \* \* \*

(3) If the taxpayer was taking accelerated depreciation and flowing through to its customers the benefits of the deferred taxes as of August 1, 1969, then the taxpayer would continue to do so (*except for a special election procedure discussed below*), unless the appropriate regulatory agency permits a change as to that property. *That is, the Act does not require the taxpayer to flow through, but it also does not affect any power the regulatory agency might have to require the taxpayer to flow through.* (Emphasis supplied.)

The first revealing aspect of this language is that all of it except the italicized portions (which were added by the Staff) was lifted, with only minor modifications, from the House and Senate Reports,[7] both of which were commenting

5. *Id.*, at 133, U.S.Code Cong. & Admin. News, p. 1783 *see also,* to the same overall effect, S.Rep.No.552 [To Accompany H.R. 13270], 91st Cong., 1st Sess. 172 (1969), U.S.Code Cong. & Admin.News, p. 2204, which states: "Accordingly, the committee agrees with the House that it is appropriate to in general [sic] 'freeze' the current situation regarding methods of depreciation in the case of those companies in what are, by and large, the more flourishing utility industries."

6. H.R.Rep.No.413, at 131–132, U.S.Code Cong. & Admin.News, p. 1782; S.Rep. No.552, at 171–172, U.S.Code Cong. & Admin.News, p. 2204.

7. The House Report describes the House Bill :

(3) If the taxpayer is taking accelerated depreciation and is flowing through to its customers the benefits of the deferred taxes, then the taxpayer must continue to do so, unless the appropriate regulatory agency permits a change as to that property.

H.R.Rep.No.413 [To Accompany H.R. 13270], 91st Cong., 1st Sess. 133 (1969), U.S.Code Cong. & Admin.News, p. 1783. The Senate Report in turn describes the House Bill :

(3) If the taxpayer is taking accelerated depreciation and flowing through to its customers the benefits of the deferred taxes, then the taxpayer would continue to do so (except as provided

on the initial House version of Section 441(a). For the Commission and Texas Gas, then, to point to this language as determinative of Congress' *final* intent in enacting Section 441(a) of the Act is unavailing. At best, this language is confusing and uncertain; it cannot carry meaning ascribed to it by the Commission and Texas Gas, particularly in view of the following page 152, discussed *infra*. Significantly, there is no mention of such continued Commission authority in this particular respect in the Conference Committee Report, an omission reflecting the conferees' resolution of the differences between the two initial versions of Section 441(a).

Furthermore, as we have seen by the provisions discussed and displayed in the chart, *supra*, there never was at any time in any version of the House, Senate, or conferees, a power in the agency to compel or permit a company to change from any method of depreciation accounting to flow-through. To have included such a provision would have been directly contrary to the overall objective of this portion of the Act—"in general to 'freeze' the current situation regarding methods

of depreciation." (As discussed pp. 863–864). After the Tax Reform Act of 1969, the permissible shifts were contemplated to be *away from* flow-through, at the company's option, with changed requirements as to agency approval and time (see chart, *supra*).

Finally, the comfort Texas Gas and the Commission derive from page 151 is taken away by page 152 of the *General Explanation*, not cited to us. There we find:

The Act permits an election to be made within 180 days after the date of enactment of the Act—i.e., by June 28, 1970—for a utility in one of the regulated industries covered by this provision to shift from the flow-through to the straight line method, with or without the permission of the appropriate regulatory agency, or to permit it with the permission of the regulatory agency to shift to the normalization method, that is, to come under general rules of the Act.

*This election applies to new property, but only to the extent it increases the taxpayer's capacity.* . . .[8]

under the committee amendments which are discussed below), unless the appropriate regulatory agency permits a change as to that property.

S.Rep.No.552 [To Accompany H.R. 13270], 91st Cong., 1st Sess. 173 (1969), U.S.Code Cong. & Admin.News, p. 2205.

8. Staff of the Joint Committee on Internal Revenue Taxation, General Explanation of the Tax Reform Act of 1969, H.R. 13270, 91st Congress, Public Law 91–172, 152 (3 December 1970). The language of the statute, as it is codified, reflects the fact that a utility's election to shift from flow-through to a different method of depreciation is applicable only to new expansion property:

*(1) Reasonable allowance in case of property of certain utilities.—*

(1) *Pre-1970 public utility property.*
(2) *Post-1969 public utility property.*
—In the case of any post-1969 public utility property, the term "reasonable allowance" as used in subsection (a) means an allowance computed under—
(A) a subsection (1) method,

(B) a method otherwise allowable under this section if the taxpayer uses a normalization method of accounting, or
(C) the applicable 1968 method, if, with respect to its pre-1970 public utility property of the same (or similar) kind most recently placed in service, the taxpayer used a flow-through method of accounting for its July 1969 accounting period.

. . . . .

*(4) Special rules as to flow-through method.—*
(A) *Election as to new property representing growth in capacity.*—If the taxpayer makes an election under this subparagraph within 180 days after the date of the enactment of this subparagraph in the manner prescribed by the Secretary or his delegate, in the case of taxable years beginning after December 31, 1970, paragraph (2) (C) shall not apply with respect to any post-1969 public utility property, to the extent that such property constitutes property which increases the productive or operational capacity of the taxpayer

Here we have set forth the rule—and the rationale therefor—of the final version of the statute. "Utilities on flow-through could elect" to change to either straight-line depreciation or accelerated depreciation with normalization within 180 days after enactment of the Act, but—"This election applies to new property, but only to the extent it increases the taxpayer's capacity."

There is nothing about old, existing, non-expansion property which "increases the taxpayer's capacity." Only new, expansion property could do so. Hence, if we bear in mind the congressional intent generally "to freeze" the present depreciation situation, it appears logical that the permissible shift in accounting practices would be limited, and that an exception might logically be made for new expansion property increasing productive capacity, at taxpayer option, and with agency approval required if the shift is to normalization. If we take Texas Gas' and the Commission's evaluation of the words on page 151—and ignore page 152 completely—then the exception is for all property and swallows up the whole, thus vitiating any congressional intent "to freeze" generally depreciation accounting practices for utilities. Texas Gas and the FPC continually urge that there are no words in this Tax Reform Act saying specifically that the Power Commission's discretion is curtailed, an argument which, to our minds, simply misses the purpose of this portion of the Act. The objectives in regard to a general freeze, in regard to balancing prospective revenue loss against possible impairment of the utilities' ability to raise capital and service customers at low rates, all would have been difficult to achieve without placing the resulting limitation on the Commis-

sion's discretion. This the language of the Tax Reform Act necessarily did, and to hold otherwise would be to undo what was most carefully done.

### III. *The Court's Caveat with Respect to the Effect of Section 411(a)*

Finally, the Commission asserts that the court's opinion is misleading in that "On the one hand, this Court finds that the Commission lost its discretion to allow Texas Gas to switch from flow-through. Yet this Court holds that the Commission has discretion to permit abandonment of flow-through in 'extraordinary circumstances.'" (Commission brief, p. 13, n. 6.)

The Commission fails to read the court's language with care. What we stated is that "There *might be* extraordinary circumstances in which Section 441(a), taken in conjunction with the mandate of the Natural Gas Act, should not be construed to prevent the FPC in its underlying responsibility to protecting consumer interests from finding that those interests would be furthered by permitting the abandonment of flow-through." [pp. 864–865 (emphasis supplied).] Clearly, the court's language indicates simply the possibility that such circumstances might exist; it does not state that they do. For the Commission to assume otherwise is to ignore the plain meaning of the court's language. What the court intended here was merely to leave open the possibility that such circumstances might exist, rather than to assume categorically that they do not.

### IV. *Conclusion*

For the reasons stated above, the petitions of the Commission and Texas Gas for rehearing are

Denied.

---

with respect to the goods or services described in paragraph (3) (A) and does not represent the replacement of existing capacity.

Int.Rev.Code of 1954, § 167(*l*) *as amended* 1969.

While some may see differently, we suggest that the intent of Congress is not readily apparent on the plain face of this statute; hence our resort to its legislative history.